[No. 9578. Department One. July 14, 1911.]

HOMER S. JONES et al., Appellants, v. ULYSSES F. HAWK et al., Respondents.[1]

SPECIFIC PERFORMANCE—FRAUD — DILIGENCE — EVIDENCE — SUFFICIENCY. Specific performance of an agreement to trade lands, rescinded on the ground of fraud before the deal was finally closed, will not be decreed, when it appears that defendant was induced to pay $32.50 per acre for land not worth over $12, by false representations as to the character of the soil, that the purported owner thereof had no interest in the lands, that the agent assuming to advise the defendant was in the pay of the other side, and that defendant's only visit to inspect the land was made at its most favorable season before the soil began to show that it was not of the character represented.

Appeal from a judgment of the superior court for Spokane county, Kennan, J., entered January 3, 1911, upon findings

[1]Reported in 116 Pac. 642.

in favor of the defendants, after a trial on the merits before
the court without a jury, in an action for specific perform-
ance.    Affirmed.

*F. W. Girand*, for appellants.

*Cullen, Lee & Foster*, for respondents.

Fullerton, J.—In the early part of the year 1910, the re-
spondent U. F. Hawk, then owning certain real property sit-
uated in the city of Spokane, listed the same with Rogers &
Rogers, real estate brokers, for sale.    The matter was put in
the hands of one R. H. Newman, who later on approached the
respondent and informed him that he had a client who had a
farm that he might exchange for his city property, and in-
quired of him whether he would consider such a proposition;
and on his giving an affirmative answer, introduced him to
one L. L. Ratliff as the person owning the farm.    Negotia-
tions were thereupon taken up between them, Ratliff represent-
ing himself as owner of the farm, and Newman advising and
assisting the respondent Hawk.    After some delay the nego-
tiations resulted in two certain written agreements for the ex-
change of properties, Hawk agreeing to pay a considerable
sum in money as the difference between the respective values
of the properties agreed to be exchanged.    Pending the final
closing up of the deal, the respondent became convinced that
he had been overreached in the transaction; that he had
agreed to pay for the farm a sum greatly in excess of its
actual value; and repudiated the agreement.    This action
was therefore begun to enforce a specific performance.    The
trial court, after a full trial, refused to enforce the agree-
ments, and this appeal followed.

That the respondent was overreached in the transaction,
the evidence abundantly shows.    He was induced to agree to
pay some thirty-two and one-half dollars per acre for a tract
of 420 acres of land which was not worth at that time to ex-
ceed twelve dollars per acre.    Whether he exercised that due

diligence to ascertain the conditions which a reasonably prudent person should exercise before entering into a contract of such magnitude, is a more serious question, and one on which the evidence is much less satisfactory. The false representations inducing the purchase related chiefly to the character and value of the land, although it may be worthy of mention that Ratliff, the purported owner, had no interest in the land at all, yet he signed the contract agreeing to convey along with the true owners, and that Newman, who pretended to be the adviser and assistant of the respondent, was actually in the employment of the other side. The land was represented to be first-class farming lands, capable of producing average crops for land of that character under ordinary tillage, and having a given area in cultivation and capable of tillage; whereas the land was not first-class farm land, but was, on the contrary, what is known in that locality as "scab land," having a very light soil, which will produce an average crop only in those seasons when the rains are peculiarly favorable, and that it had a much less area capable of being tilled than was represented. The respondent visited the place but once before making the trade. He arrived there late in the evening of one day and left in the afternoon of the next. According to his own statement he made no close inspection of the property, but simply looked at it generally, such an inspection as could be made by a hurried walk across a field; the time at the farm being taken up principally in a discussion of the terms of the deal. Moreover, the visit was made at the farm's most favorable season, when the verdure was at its best, and before the soil began to show evidences of its incapacity to retain moisture.

The appellants rely upon the rule, often announced by this court, to the effect that one who has means of knowledge before him and refuses or neglects to avail himself of such means of knowledge cannot afterwards be heard to assert that he was defrauded. *Zilke v. Woodley*, 36 Wash. 84, 78 Pac. 299, and the kindred cases to which reference is there made. But

we think this too harsh a rule to be applied to the facts here shown. It cannot be denied that the respondent was grossly defrauded, and that all of the parties to the other side of the contract participated in that fraud. The respondent's conduct was not reckless. To discover the fraud, a careful examination of the land would have had to be made, and probably inquiry among the neighboring land owners, who would at best have been reluctant about informing him of the exact conditions. Under the facts shown, therefore, we think the trial court was justified in affording relief.

"Where it is to the court perfectly plain that one party has overreached the other, and has gained an unjust and undeserved advantage which it would be inequitable and unrighteous to permit him to enforce, we do not believe that a court of equity should hesitate to interfere, even though the victimized parties owe their predicament largely to their own stupidity and carelessness. It is well known that many good people, and people of average or greater intelligence, are sometimes duped and misled by the skill, cleverness, and artifices of those who are adepts in the matter of deceiving their fellow men; and courts should not throw about schemers of this kind a protection that will tend to encourage the practice of their arts. Such people should not find encouragement in the thought that, by keeping their machinations within the letter of the law, they may find sanction for their practices and reap the reward of their craftiness. To the victim it is of little import whether his property is taken from him by a bold and forcible robbery, or by an ingenious and unsuspected deception. The injury to him is the same; and the evil effect of court decisions which permit the wrongdoer to enjoy the fruits of his chicanery is of no small import when viewed from the standpoint of public policy. It is not the function of courts to make contracts for parties, or to relieve them from the effects of bad bargains. But where the simplicity and credulity of people are taken advantage of by the shrewdness, overreaching and misrepresentation of those with whom they are dealing, and they are thereby induced to do unwittingly something the effect of which they do not intend, foresee, or comprehend, and which, if permitted to culminate, would be shocking to equity and good conscience, we think a

court of equity may with propriety interpose." *Stone v. Moody*, 41 Wash. 680, 84 Pac. 617, 5 L. R. A. (N. S.) 799. See, also, *Wooddy v. Benton Water Co.*, 54 Wash. 124, 102 Pac. 1054, 132 Am. St. 1102; *Bailie v. Parker*, 56 Wash. 353, 105 Pac. 834; *Lindsay v. Davidson*, 57 Wash. 517, 107 Pac. 514; *Best v. Offield*, 59 Wash. 466, 110 Pac. 17, 30 L. R. A. (N. S.) 55.

The judgment is affirmed.

DUNBAR, C. J., GOSE, PARKER, and MOUNT, JJ., concur.