[Civ. No. 4421.  Second Appellate District, Division Two.—February 23, 1924.]

## A. C. PALLADINE et al., Respondents, v. IMPERIAL VALLEY FARM LANDS ASSOCIATION (a Corporation) et al., Appellants.

[1] VENDOR AND VENDEE—CONFLICTING EVIDENCE—APPEAL.—Where there is a substantial conflict in the evidence the appellate court must assume the testimony of the prevailing party to be true and construe it as favorably to him as possible; and this is the rule even in · those cases where the law requires clear and convincing proof.

[2] ID.—FREEDOM OF LAND FROM ALKALI—REPRESENTATION OF FACT. The representation by the vendor that certain land is free from alkali is not a matter of opinion upon which the purchasers have no right to rely, when such representation is not given in the form of an opinion but is made, by one who holds himself out as an expert, as the affirmation of an existing fact upon which the purchasers, who are ignorant of condition in the locality, can safely rely.

[3] ID.—REPRESENTATION OF FACT—EXPRESSION OF OPINION—PROVINCE OF JURY.—When it is impossible to determine, as a matter of law, whether a statement is the expression of an opinion or is the representation of a fact which the defendant intended to be understood as true of his own knowledge, the question is one for the jury.

[4] ID.—ADAPTABILITY OF LAND—ABSENCE OF· DECEIT.—A mere naked assertion, without more, that land is suitable for the growth of some particular crop, though known to the vendor to be untrue, does not constitute actionable deceit.

[5] ID.—RECOMMENDATIONS BY EXPERT—ACTIONABLE DECEIT.—Where the purchasers know nothing of the seller's lands or of their adaptability for the growth of grapes or other crops, and the seller's manager is held out as one having, and he in fact does have, knowledge of the facts, and he recommends to the purchasers that the land is excellent for the raising of grapes and for general farming purposes, whereas the land is not adapted for such purposes, the misrepresentation is actionable deceit.

[6] ID.—KNOWLEDGE OF FALSITY—EVIDENCE.—In an action for damages for fraudulent representations in the sale of land, direct and

2.  Right to rely on representations of vendor as to quality or condition of soil, note, L. R. A. 1917C, 273.

positive proof of the knowledge of the falsity of the representation is not required, but the scienter may be inferred from other facts in the case; and it is for the jury to determine from all the circumstances whether the defendants knew the representations to be false.

[7] ID.—LAND NOT COVERED BY SEA—MATERIAL REPRESENTATION.—The statement that the land had not been covered by the waters of the Salton Sea was a material representation, and the nature of the statement was such that it naturally must have influenced the purchasers in making their contract to purchase the land, and the falsity of such representation was a source of injury to the purchasers.

[8] ID.—VIEW OF LAND BY VENDEE—RELIANCE UPON VENDOR'S STATEMENTS.—The fact that the purchaser drove on to the land and saw it prior to purchasing it does not necessarily charge him with knowledge of the facts, or establish that he relied upon his own judgment, or debar him from claiming that he relied solely upon the representations made to him.

[9] ID.—DEALINGS BETWEEN MEMBERS OF FRATERNAL ORDER—TRUST RELATIONSHIP.—When two men deal with each other as members of the same fraternal order, and one accepts as true the representations of the other, into which but for the fraternal relation he would have made inquiry, the law will protect him in his trust.

[10] ID. — FRAUD — MISREPRESENTATIONS NOT IN CONTRACT. — A provision in a contract for the sale of land that the vendor will not be responsible for any representation not set forth in the contract will not estop the purchasers from recovering damages for fraudulent representations as to the character of the land, as the fraud which was the inducing cause of the execution of the contract renders the whole instrument vulnerable—the clause in question as well as the other provisions.

[11] ID.—SEVERAL TRANSACTIONS—MISREPRESENTATIONS AS CONTINUING INFLUENCE.—In this action for damages for fraudulent representations in the sale of a section of land, the jury was warranted in finding that the false representations by which plaintiffs were induced to purchase half of the section continued to influence the minds of plaintiffs after they had agreed to make such purchase and until their execution of the final contract for the purchase of the entire section; and it was not incumbent upon plaintiffs to show by direct and positive evidence the continuing effect of the fraudulent representations as the inducing cause of the finally executed contract.

---

8.   Whether fraudulent representations by vendor of extent or proportion of land of particular kind included within tract sold is actionable where purchaser inspects the land, note, 30 L. R. A. (N. S.) 55.

[12] ID.—EVIDENCE—JOINDER OF MATERIAL AND IMMATERIAL REPRE-SENTATIONS.—When representations which are matter of opinion and not of fact are made in connection with others which are material as tending to establish the plaintiff's case, they should not be ruled out, but the entire statement should be received and considered together.

[13] ID.—DISCOVERY OF FRAUD—WITHHOLDING OF PAYMENTS.—One in-duced by fraud to enter into a contract for the purchase of real estate may withhold payments after the discovery of the fraud and pending the action for damages; but he must be willing and able to pay if and when he shall become liable therefor.

[14] ID.—PRELIMINARY DOCUMENTS—IMMATERIAL EVIDENCE—PREJU-DICE.—In an action for damages for fraudulent representations in the sale of land, preliminary documents preceding the signing of the instruments which plaintiffs claim was the corrected and final contract for the purchase of the land are immaterial; and where the circumstances were such that the evidence may have created in the minds of the jurors that the officers of the seller were fraudulently seeking to impose upon plaintiffs a contract other than the one upon which the parties had agreed, it cannot be said that the improper admission of such immaterial evidence did not injure defendants.

[15] ID.—FINAL CONTRACT—LETTER FROM SECRETARY—IMPROPER EVI-DENCE.—In an action for damages for fraudulent representations in the sale of land, a letter from the seller's secretary is not ad-missible to show an acceptance by the seller of what is claimed to have been the finally executed contract where there is nothing to warrant the inference that by his allusion to the "contract" the writer of the letter intended that the reference should be to the last of the two instruments signed by the parties, and no foundation is laid for the introduction of the letter by showing authority in the secretary to say which one of the instruments was accepted by his principal as its final contract with plaintiffs.

[16] ID.—MEAGER CROPS ON NEIGHBORING LANDS—IRRELEVANT EVI-DENCE.—In this action for damages for fraudulent representations in the sale of land, which was represented to be adapted to the raising of certain crops, it was error to admit in evidence the testimony of neighboring farmers as to the meager crops raised by them on their lands. Such evidence, injecting collateral issues into a case, should be received with caution, and then only when it is obvious to the court, from the similarity of conditions, that it affords a safe and reliable standard of comparison.

[17] ID.—MATERIAL REPRESENTATIONS—INSTRUCTIONS.—Each of the representations specifically referred to in one of the instructions requested by plaintiffs having been material and actionable, there

was no merit in defendants' contention that the instruction was objectionable upon the score that it failed to single out the false representations that were material and separate them from those which defendants claimed were but expressions of opinion and immaterial; and even if one of them were immaterial the appellate court would hesitate to reverse the judgment for that reason alone.

[18] ID.—INTENT TO DECEIVE—CIRCUMSTANTIAL EVIDENCE—INSTRUCTIONS.—In an action for damages for fraudulent representations in the sale of land, the jury is correctly instructed that it is not necessary to prove by direct or positive evidence the intent to deceive, but that it is sufficient to prove facts from which such intent may be drawn—that the intent to deceive may be inferred from circumstances in evidence.

[19] ID.—REPRESENTATIONS BY EXPERT—VIOLATION OF CONFIDENCE REPOSED.—If the vendor holds himself out as an expert possessing superior knowledge of the subject matter of the sale, and the vendee does not possess such expert knowledge, and if the latter, during the preliminary negotiations, expressly reposes confidence in the vendor's superior knowledge as an expert and gives the latter to understand that he is going to rely upon the truth of his representations, he may safely rely thereon irrespective of whether there is or is not a legal fiduciary relation between the two; and the confidence thus reposed by the vendee must not be abused.

[20] ID.—MEASURE OF DAMAGES—DEDUCTION OF UNPAID BALANCE—INSTRUCTIONS.—In an action for damages for fraudulent representation in the sale of land, the jury is properly advised that the measure of damages is the difference between the actual value of the property and value which it would have possessed had it been as represented; but it is error to further instruct the jury that, if they find for plaintiffs, they should not deduct from the total amount of damages any unpaid portion of the purchase price but should assess the damages irrespective of any unpaid balance.

[21] ID. — MEANS OF INVESTIGATING FACTS — FAILURE TO MAKE INQUIRY—INSTRUCTIONS.—In an action for damages for fraudulent representation in the sale of land, it is not error to modify defendants' requested instruction to the effect that plaintiffs cannot recover if they had the means of investigating the facts and did not do so, or if the circumstances attending the transaction were such as to put plaintiffs upon inquiry and they did not make any inquiry, by adding thereto the clause "unless you further find

21.  General rules as to right to rely on representations, note, 37 L. R. A. 593 et seq.

that plaintiffs were induced to refrain from investigation by acts and statements of the defendants."

[22] ID. — EQUAL MEANS OF KNOWLEDGE — WHEN EXAMINATION EXCUSED.—Where the parties stand upon an equal footing and have equal means of knowing the truth, and the vendee's suspicions are not lulled by the nature of the representation, an examination by the buyer will be excused only when he is fraudulently induced to forego examination, or where trick or artifice has prevented him from doing so.

[23] ID.—CONSEQUENCE OF REPRESENTATIONS—INSTRUCTIONS—USE OF EXPRESSION "LULLED."—The evidence on behalf of plaintiff having shown that one of the consequences of the representations by the vendor's manager was to disarm plaintiff's vigilance and to lull his suspicions, it was not error to instruct the jury that they might consider whether plaintiff was put upon inquiry or whether he was "lulled" into a reliance upon any representations made at the time of the sale.

[24] ID.—PRICE OF OTHER LANDS—IMPROPER EVIDENCE OF VALUE.—In an action for damages for fraudulent representation in the sale of land, the prices at which other lands of like quality and adaptability and similarly situated could be purchased do not constitute a proper standard for ascertaining the actual value of the land in question; and it is error to refuse to instruct the jury that in determining the fair market value of the land in question they should not consider whether land of similar character could have been purchased at a lower price in other localities.

[25] ID. — PROPER CROSS-EXAMINATION — INSTRUCTIONS. — As cross-examination, in an action for damages for fraudulent representation in the sale of land, testimony as to the prices at which other similar lands could be bought is proper for the purpose of testing the witnesses' knowledge and impeaching their opinions, but not for the purpose of fixing the value of the land in question; and the jury should be so advised, if such an instruction is requested.

APPEAL from a judgment of the Superior Court of Imperial County. Franklin J. Cole, Judge. Reversed.

The facts are stated in the opinion of the court.

Luther G. Brown and Leon R. Yankwich for Appellants.

Hickox, Crenshaw & Trude and L. B. Stanton for Respondents.

FINLAYSON, P. J.—This is an action to recover damages for fraudulent representations made in the sale of a section of land in the Imperial Valley, hereafter referred to as section 13. The case was tried before a jury. A judgment of nonsuit was entered in favor of the defendant Janss Investment Company. A verdict in the sum of twenty-five thousand dollars was returned against the defendants Imperial Valley Farm Lands Association and H. H. Clark, both of whom have appealed from the judgment.

The following outline of some of the principal facts will suffice for an understanding of the points to be discussed: The defendant Clark is the general manager at Calipatria of the Imperial Valley Farm Lands Association—hereafter referred to as the Association. The Association owned some forty-seven thousand acres of land in the Imperial Valley which it desired to sell. It inserted an advertisement in a Los Angeles newspaper advertising the lands for sale. It likewise caused to be published a printed folder which contained a map of the lands and certain information respecting the properties. In this folder the Association made certain representations, of a more or less general nature, respecting the character of Imperial Valley lands, as, for example, that they are the choicest farm properties in the world—marvelous lands that frequently pay for themselves in one year, and that many of the valley's record-breaking crops were grown on the lands of the Association.

Plaintiffs are husband and wife. They purchased section 13 from the Association. The negotiations with defendants were carried on by the husband, A. C. Palladine, whom we shall refer to as the plaintiff, using the plural, plaintiffs, only when referring to both husband and wife. Plaintiff, a man of sixty-eight years and of impaired eyesight, had been a viticulturist in Fresno County for more than thirty years prior to purchasing section 13. His attention was attracted to the newspaper advertisement of the Association's Imperial Valley Lands, and early in March of 1920, in company with his wife and their two sons, he called at the office of the Janss Investment Company, which was acting as sales agent for the Association, and had a talk with a Mr. Link, an employee of the sales agent whose office was in Los Angeles. Link told plaintiff that the Association had large tracts of land for sale; that the soil is of great

fertility and depth; that it is suitable for the growth of citrus fruits and vegetables, and that no better land can be found in the world. Link showed plaintiff the folder published by the Association. Mrs. Palladine read it to her husband. Plaintiff asked Link about alkali. Link stated that there was no alkali on the Association's lands. Thereupon plaintiff said that it was well—that it would be useless for him to go to the Imperial Valley to look at alkali land. Plaintiff informed Link that he was looking for grape land and general farming land. Link gave to plaintiff, or to one of his sons for him, a letter of introduction to the defendant Clark, at the same time telling plaintiff that Clark, the Association's general manager at Calipatria, was an honorable gentleman upon whose judgment plaintiff could rely. The next evening plaintiff, his wife, and two sons took the train for Calipatria, arriving there the following morning. Plaintiff was a stranger in the Imperial Valley. He had never previously visited that section of the state. On the morning of their arrival plaintiff, his wife, and sons, with other prospective purchasers, accompanied by Clark and Link, were taken in automobiles to see the Association's lands.

Though there is a sharp and irreconcilable conflict in the testimony with regard to the representations claimed to have been made during the time that Clark was showing plaintiff the Association's properties, we shall state the events substantially as they were narrated by plaintiff and his witnesses. [1] This we do in view of the well-known rule that where there is a substantial conflict in the evidence the appellate court must assume the testimony of the prevailing party to be true and construe it as favorably to him as possible. And this is the rule even in those cases where the law requires clear and convincing proof. (*Couts* v. *Winston,* 153 Cal. 686 [96 Pac. 357].)

What occurred after Clark took charge of the party is described by plaintiff and his witnesses substantially as follows: Plaintiff and the other members of the party, including plaintiff's wife and their two sons, were first shown the Clark ranch—a half section of land owned by the defendant Clark and situated some five or six miles south of section 13. Growing upon the Clark ranch were fine specimens of olive, fig, apricot, peach, pomegranate, and citrus

trees, as well as grapevines, alfalfa, and garden truck. Clark told plaintiff that the lands which would be shown him during the day would grow anything that would grow on the Clark ranch, and that the soil was the same. From the Clark ranch the party was driven to section 19. While motoring toward section 19 one of plaintiff's sons saw a patch of white substance on the bank of a ditch. He asked Clark if it was alkali. The latter assured the son, in his father's hearing, that it was not alkali, but that it was chalk washed down from the Colorado River. During the course of the trip, and before arriving at section 13, plaintiff informed Clark, with whom he was riding, that he had spent his life in vineyards and was acquainted only with viticulture; that he was in the Imperial Valley for the purpose of looking for land on which to grow grapes, and that as he and Clark were members of the same fraternal order he wished Clark would assist him in finding such land, telling the latter that he was wholly unfamiliar with conditions in the valley.

From section 19 the party was driven to section 13, where the automobiles were stopped in the road which passed through this section. While seated in the automobile during the time that the party halted somewhere near the center of section 13 Clark told plaintiff that the section was fine, level land, gently sloping to the west, thus making it easy to irrigate; that the southeast quarter had been recently planted to barley; that the northeast quarter had been in cultivation the previous year; that it was perfectly level and could be planted to cotton, and that though the west half had not been cleared, it was good, level land and not hard to clear and border. One of the plaintiff's sons asked Clark if the Salton Sea had ever been over the land. Clark replied that it had not—that the sea never rose higher than a certain line shown on the map which the Association had published as a part of the folder that had been given to plaintiff by Link. Plaintiff asked Clark if he could especially recommend section 13 for grape land and for general farming purposes. In reply Clark said that it is the best section in the north end of the Imperial Valley; that it is the same sort of land as that which constitutes the Clark ranch; that it will grow anything that can be grown on the Clark ranch, and that it is especially adapted

to the growing of grapes and general farming. One of plaintiff's sons then asked Clark if there was any alkali in the section. To this query Clark replied: "I told you once before there is no alkali in the Imperial Valley."

At no time while on section 13 did plaintiff get out of the automobile in which he was riding. He made no examination of the land other than such as could be made by one of his impaired eyesight while sitting in the automobile as it traveled along, or stopped for a short time in the road which passed through the section. Instead of making a careful examination of the land, plaintiff, so he says, relied entirely upon Clark's judgment. He testified that the only reason why he did not make a personal examination of the land to see if it was suitable for his purpose—the raising of grapes and general farming—was that he relied entirely upon Clark, and that but for the latter's recommendation and representations he would not have purchased the property. After the very cursory view of the land made by him as he sat in Clark's automobile, and as the automobile started to leave the spot where the party had stopped to glance over the section, plaintiff, who had discovered that he and Clark were members of the same fraternal order, said: "Mr. Clark, if all the representations that you make of this place are true, and if you give me your word as a Mason, I will take this section." To this Clark replied that not only were his representations true, but that the land was even better than he had represented it to be.

In 1908 the Salton Sea overflowed a very considerable territory in the vicinity of this land. The waters of the sea covered all of section 13 for a period of about five years. As a consequence, the land is heavily impregnated with alkali—so much so that only such plant life will thrive thereon as is very resistant to alkali. Witnesses for plaintiff testified that the land in its present condition is not suitable for the growth of grapes or for general farming purposes. In addition to the alkali left on the land during the five years that it was covered by the Salton Sea, much alkali has been brought down to it by a ditch which drains upper parcels of land.

On the return trip to Calipatria, after their visit to section 13, plaintiff changed his mind about buying the entire

section and concluded to purchase only the east half. He so informed Mr. Clark. A few days later plaintiff and his wife signed a contract to purchase the east half of the section. At the same time they made a part payment on the purchase price. A few days later, about March 26, 1920, being persuaded thereto by Clark, so plaintiff says, the Palladines, husband and wife, executed a new contract— a contract to purchase the whole section—and, at the same time, made a further payment. For some reason, perhaps due to a mistake on the part of the scrivener, the written instrument fixed the eighteenth day of March of the suceeding years as the dates upon which the deferred annual installments of the balance of the purchase price should be paid. In their preliminary negotiations the parties had agreed that the deferred payments should be due on the first of July of each year. Accordingly, another written contract for the purchase of the entire section was prepared and signed by the parties. In this last instrument July 1st was substituted for March 18th. Not until some time after this last instrument was signed did plaintiffs discover the fraud of which they complain.

The principal misrepresentations, as set forth in the complaint, are: (1) That there is no alkali on section 13; (2) that the section is excellent land for the raising of grapes and for general farming purposes, and (3) that the section has never been covered by the Salton Sea.

The grounds of the appeal are: (1) That some of the representations are but expressions of opinion, and that such as are statements of fact do not constitute actionable fraud; (2) that plaintiffs waived the fraud; (3) that error was committed in the admission of certain evidence; and (4) that the court erred in giving and in refusing certain instructions and in modifying one of defendants' requested instructions.

Three or four of the assignments of error—errors in the admission of evidence and in giving and refusing certain instructions—are not only well taken but involve errors so prejudicial to appellants' substantial rights as to necessitate a reversal of the judgment and a remanding of the cause. A consideration of these errors would be sufficient to dispose of the appeal, but as the case must go back for a new trial it is expedient that we should pass upon and deter-

mine all questions of law presented by counsel which are likely to arise upon the retrial; for sooner or later they must be decided in order to settle this controversy. We shall proceed to an examination of the points substantially in the order of their presentation by counsel.

[2] 1. The representation that the land is free of alkali is not a matter of opinion upon which the purchasers had no right to rely. It was not given in the form of an opinion but was made by Clark as the affirmation of an existing fact upon which the purchasers, who were ignorant of conditions in the Imperial Valley, could safely rely. It not only was the affirmation of one who held himself out as an expert in such matters, but was made under such circumstances as to warrant the jury in inferring that Clark's unequivocal affirmation involved the necessary implication that he was acquainted with facts which justified his statement. "If the facts are not equally known to both sides, then a statement of opinion by the one who knows the fact best involves very often a statement of a material fact, for he impliedly states that he knows facts which justify his opinion." Lord Bowen, in *Smith* v. *Land etc. Corp.,* 28 L. R. Ch. Div. 15, quoted in *McDonald* v. *Smith,* 139 Mich. 211 [102 N. W. 668], and in *Olston* v. *Oregon Water Power etc. Co.,* 52 Or. 343 [20 L. R. A. (N. S.) 915, 926, 96 Pac. 1095, 97 Pac. 538]. (See, also, *Armstrong* v. *Rachow,* 205 Mich. 168 [171 N. W. 389].) It is said in *Hall* v. *Mitchell,* 59 Cal. App. 752 [211 Pac. 857], that "where the statement of the opinion is necessarily based upon a fact, or carries such inference that it must be regarded as the statement of a fact, and is known to be false and is made with intent to deceive, it may be actionable." In *Como Orchard L. Co.* v. *Markham,* 54 Mont. 438 [171 Pac. 274], the court said: "We think the following rule is sustained by reason and the authorities: If the party expressing the opinion possesses superior knowledge, such as would reasonably justify the conclusion that his opinion carries with it the implied assertion that he knows the facts which justify it, his statement is actionable if he knows that he does not honestly entertain the opinion because it is contrary to the facts." (See, also, *Henry* v. *Continental Building etc. Assn.,* 156 Cal. 680 [105 Pac. 960]; *Edward Barron Estate* v. *Woodruff,* 163 Cal. 561 [42 L. R. A. (N. S.) 125, 126 Pac. 351], and 12 R. C. L., p. 380.)

65 Cal. App.—47

Moreover, the representation falls within the rule enunciated in *Herdan* v. *Hanson,* 182 Cal. 546 [189 Pac. 444], that "when a statement concerning a subject matter of a transaction, which might otherwise be only an expression of opinion, is affirmed as an existing fact material to the transaction and reasonably induces the other party to consider and rely upon it as a fact, the statement then becomes an affirmation of fact within the meaning of the general rule as to fraudulent representations." (See, also, *Crandall* v. *Parks,* 152 Cal. 772 [93 Pac. 1018]; *Edward Barron Estate* v. *Woodruff, supra;* 2 Pomeroy's Equity Jurisprudence, sec. 878.)

In *Scott* v. *Delta Land etc. Co.,* 57 Cal. App. 320 [207 Pac. 389], the representations set out in the complaint were that the land "was of the best quality, fertile in every respect, *free from alkali* and noxious weeds, and suitable for growing thereon all kinds of crops of hay, grain and vegetables." (Italics ours.) Other representations were made which are not material to be set forth here. It was held that the judgment might be sustained upon evidence showing the making of any one of the material representations pleaded in the complaint. In *Stone* v. *McCarty,* 64 Cal. App. 158 [220 Pac. 690], it was held that statements made by a vendor or his agent to a party unfamiliar with the land or soil that the land was *free from hardpan,* that nursery trees growing on the land were of a stated value, and that the trees would soon be ready for market and were already budded, and that if they were properly irrigated the vendee could easily sell them for a stated price, and that the soil was adapted to the growing of fruit trees, are not expressions of opinion but amount to representations such as to give rise to a cause of action if false.

[3] Even if it were assumed that the court could not say, as a matter of law, that the statement that the land was free of alkali was the representation of a fact, it would be equally true that it could not be said, as a matter of law, that the statement amounted to nothing more than an expression of opinion. Hence it became at least a question for the jury to decide whether the statement was a mere expression of opinion or the representation of a fact. When it is impossible to determine, as a matter of law, whether

a statement is the expression of an opinion or is the representation of a fact which the defendant intended to be understood as true of his own knowledge, the question is one for the jury.   (*Olston* v. *Oregon Water Power etc. Co., supra; Ward* v. *Jenson,* 87 Or. 314 [170 Pac. 538]; *Pacific Gas etc. Co.* v. *Almanzo,* 22 Ariz. 431 [198 Pac. 457]; 12 R. C. L., p. 446.)

[4] 2.  Under the circumstances here presented the representation that section 13 is excellent land for the raising of grapes and for general farming purposes was more than a mere expression of opinion.   It was a statement upon which the purchasers had the right to rely as the affirmation of a known fact.   Had the statement stood alone it doubtless would have been but an expression of opinion.   (*Rendell* v. *Scott,* 70 Cal. 514 [11 Pac. 779]; *Lee* v. *McClelland,* 120 Cal. 147 [52 Pac. 300]); for the general rule is that a mere naked assertion, without more, that land is suitable for the growth of some particular crop, though known to the vendor to be untrue, does not constitute actionable deceit.  This is so because in most cases such an assertion is, and is understood to be, the statement of an opinion and not of a fact, and therefore the party to whom it is made has no right to rely upon it.   But to the general rule that such statements are only expressions of opinion there are many exceptions, arising out of the special circumstances under which the representation is made, as, for instance, where the seller has, or assumes to have, a special or expert knowledge of the subject and the buyer does not possess equal opportunity for knowing the facts but, to the seller's knowledge, trusts entirely to the latter's representation.   (*Gustafson* v. *Rustemeyer,* 70 Conn. 125 [66 Am. St. Rep. 92, 39 L. R. A. 644, 39 Atl. 104].)   In *Stonemets* v. *Head,* 248 Mo. 243 [154 S. W. 108], it is said that "courts generally recognize that where parties do not stand on an equal footing of opportunity and knowledge, a positive assertion of a matter, which, stated in another form might be a mere opinion, may, when false and fraudulent, be actionable if the statement was a material inducement to the trade or sale."

[5]  Here the seller's manager, Clark, was held out as one who would give to prospective purchasers expert advice as

to what lands were best adapted to the buyers' purposes. These plaintiffs knew nothing of the Association's Imperial Valley lands or of their adaptability for the growth of grapes or other crops; whereas Clark assumed to have, and did in fact have, a special knowledge of all these lands—a knowledge which was based on the past experience of himself and others. In a preceding year the Association, while Clark was its general manager at Calipatria, had rented the east half of this particular section to a tenant on a crop-sharing basis. This fact, with other circumstances which were adduced in evidence, warranted the jury in drawing the inference that Clark's knowledge of the land was exceptional and unique. Clark, if plaintiff's testimony is to be believed, knew that the latter was purchasing the land with the intention of raising grapes thereon. According to the testimony of the experts, grapes cannot be grown on soil which is impregnated with more than four-tenths of one per cent of alkali. The top soil of this section, if the testimony of plaintiffs' experts be true, contains, on an average, 1.50 per cent, and the subsoil 1.38 per cent of alkali. Clark, who had had practical experience as a viticulturist, testified that he always was of the opinion that these lands contained alkali. And yet, as one having superior facilities for knowing the facts, he recommended the section to plaintiff as land which was suitable for the purposes for which plaintiff told him the land was being purchased.

Under these circumstances the misrepresentation as to the adaptability of the soil for the culture of grapes was actionable deceit. While it is true that the man without special knowledge is prone to overvalue his property, yet, as was said by the South Dakota supreme court, "it is likewise true that in all lines of business, and in connection with all kinds and classes of property, we have those who, through special study or unusual opportunities and experience, have become possessed of unusual information regarding the value or quality of some particular piece or class of property, so that their judgment thereon is accurate, and little, if any, influenced by the fact of personal interest therein. Upon the honest judgment of such a person the law, based as it is upon human experience, gives another the right to rely, even in connection with a transaction between such parties, unless both parties are possessed of such special

knowledge. This right is given though the party may have an opportunity to see and inspect the property himself, because the law recognizes that even then the judgment of the one should be superior to that of the other; that, under such circumstances, the statement of opinion as to the value of property is a statement of a material fact, the fact that such opinion exists." (*Rodee* v. *Seaman,* 33 S. D. 184 [145 N. W. 441].) In *Wendell* v. *Ozark Orchard Co.* (Mo. App.), 200 S. W. 747, it was held that false representations as to the productiveness of a peach orchard and as to the enhanced value of the land because of its being fruit land should be regarded as representative of existing conditions and fraudulent, because made by one having superior knowledge based upon the past experiences of himself and others. In that case it was said: "It is claimed that these representations as to the productiveness of the peach orchard and the enhanced value of this land because of its being fruit land were mere matters of opinion and related to future events rather than to existing facts, and therefore do not sustain allegations of fraud. It will be found, however, that false representations and promises as to what will result in the future, when made by one having or professing to have superior knowledge based on the past experience of himself or of others, are in effect false representations of existing conditions and support allegations of fraud. Should the selling agent of an automobile company falsely represent that an automobile would sustain a speed of 50 miles an hour, or would average 15 miles per gallon of gasoline, no one would doubt but that an inexperienced buyer, on discovery that such machine would not run to exceed 20 miles per hour, and would consume a gallon of gasoline for every 7 or 8 miles, would not be turned out of court because the false representations were mere opinions and related to the future. Even representations of value often afford a solid basis for actionable fraud." (See, also, *Hall* v. *Mitchell, supra,* and *Stone* v. *McCarty, supra.*)

3. It will not be necessary to consider appellants' claim that there is no evidence of the falsity of the representation respecting the price at which water could be bought. Respondents practically concede that the evidence does not support the allegation of the falsity of that representation.

Nor is it incumbent upon us to consider the representation to the effect that the east half of the section was level land, as that is not alleged in the complaint as one of the representations inducing the contract. Neither will it be necessary to consider appellants' claim that the evidence fails to establish that they had knowledge of the falsity of the representation that the land had not been inundated by the Salton Sea. **[6]** Since the case must be remanded, and since the evidence to be adduced at the second trial may supply any deficiency in this particular, if deficiency there be, it will not be necessary to consider this point further than to say, as a guide to court and counsel, that in cases such as this direct and positive proof of the knowledge of the falsity of the representation is not required. The scienter may be inferred from other facts in the case; and it is for the jury to determine from all the circumstances whether the defendants knew the representations to be false. (*Hiner* v. *Richter*, 51 Ill. 299.) Furthermore, as to this particular representation the scienter seems to be admitted by the pleadings.

**[7]** 4. The statement that the land had not been covered by the waters of the Salton Sea was a material representation. The nature of the statement is such that it naturally must have influenced plaintiffs in making their contract to purchase the land. Throughout the negotiations plaintiff was at pains to emphasize the fact that he would have naught to do with alkali land. That the falsity of the representation concerning the Salton Sea was a source of injury to plaintiffs is beyond question. Obviously the inundation, with its consequent deposit of salts, must have had a most deleterious effect upon the soil. It is alleged in the complaint and admitted by the answer that these lands "were deeply covered by the briny waters of the Salton Sea *and have become thoroughly impregnated with salt.*" (Italics ours.) From the testimony of the experts it appears that land containing more than four-tenths of one per cent of salt or alkali is practically valueless for all ordinary farming purposes, and that only at considerable expense can alkali land be reclaimed, and then only if there be no impervious layer underlying the soil to prevent the necessary drainage. There is testimony that the subsoil in section 13 is a heavy clay, and that it tends to retard the

natural drainage from the top soil. It seems self-evident that, other things being equal, land upon which the briny waters of an inland sea have stood for several years necessarily must contain far more deleterious substances than would be the case with similar land which has not been thus submerged.

Appellants contend, however, that plaintiff's testimony is such that it compels the conclusion that he was not influenced by the representation respecting the waters of the Salton Sea. It seems that on his cross-examination plaintiff testified as follows: "Q. In the purchase of both the first half section, and later in making the purchase of the other half section, you relied entirely upon Mr. Clark; that is correct, is it? A. Yes, sir. Q. And then if he told you it was submerged and that made it better land, or good land, or advised you to buy it, you would have bought it just the same, wouldn't you? A. I believe I did just the same, you know. Q. If you had known the land was covered with water, had been covered with water, and he would have advised you to buy it, you would have still bought it on his advice, wouldn't you? A. Yes, sir; at that time I had full confidence in Mr. Clark." This testimony is far from justifying appellants' claim that plaintiff entered into the contract uninfluenced by Clark's representation that the land had not been inundated. The questions put to plaintiff on his cross-examination, questions adroitly propounded by skillful counsel, postulate a purely hypothetical situation; and it was that supposititious situation to which plaintiff was addressing himself when replying to counsel's skillful questioning. The witness did not say that he was not influenced by Clark's statement that the sea had not submerged the land. What he did say, in effect, is that his confidence in Clark was so great that he would have entered into the contract even though he had known that the land had been covered by the waters of the sea, *provided Clark had advised him to do so.* His answers, far from showing that he would have purchased the land had he known Clark's representation to be false, show that he placed such implicit reliance in Clark that he would have taken the latter's word at its full face value without questioning it, even though it had amounted to a statement that the submergence of land by the waters of this sea improves it, but

that unless he was assured by Clark that the sea water does improve land, he would not have purchased if he had known that the property had indeed been under the waters of this inland sea.

[8] 5. The fact that plaintiff drove on to the land and saw it prior to purchasing it does not necessarily charge him with knowledge of the facts, or establish that he relied upon his own judgment, or debar him from claiming that he relied solely upon the representations made to him. The fact that a vendee visits the property does not necessarily preclude him from saying that he relied upon his vendor's statements. (*French* v. *Freeman,* 191 Cal. 579 [217 Pac. 515]; *Kincaid* v. *Price,* 82 Ark. 20 [100 S. W. 76]; *Jones* v. *Hawk,* 64 Wash. 171 [116 Pac. 642]; *Wooddy* v. *Benton Water Co.,* 54 Wash. 124 [132 Am. St. Rep. 1102, 102 Pac. 1054].)

There was that in the relations of these two men, Clark and A. C. Palladine, which was calculated to disarm caution. It seems that in the course of the trip and prior to the party's arrival at section 13 plaintiff discovered that he and Clark were members of the same secret order. Plaintiff testified that some time after he and Clark had made themselves known to each other as brothers in the same fraternal organization, and after the party had arrived at section 13 but prior to the closing of the deal, the following conversation occurred: Plaintiff, addressing Clark, said: "Mr. Clark, I am helpless [referring, doubtless, to his purblindness and to his unfamiliarity with the conditions in that part of the state]. I will charge you for myself. Will you advise me as a gentleman and a Mason if this land grows grapes, fruit, cotton, alfalfa, etc.?" To this Clark replied: "Certainly, this land will grow grapes, fruit, some other things and cantaloupes, and will grow anything that will grow outside of doors." Thereupon plaintiff asked Clark if the soil was good, to which Clark replied: "It is all sandy loam of great fertility and rich." One of plaintiff's sons testified that his father said to Clark: "Mr. Clark, if all the representations that you make of this place is true, and you give me your word as a Mason that they are true, I will take this section of land"; and that to this Clark replied that his representations were true and that the land was even better than he had represented it to be. Thereupon

the deal was closed. It is due to Mr. Clark to say that these conversations are denied by him; but though his testimony in many particulars is corroborated by that of disinterested witnesses in the case, the jury chose to believe plaintiff and his witnesses, and we, perforce, must accept the testimony of the latter as true for all the purposes of this appeal.

If the testimony of plaintiff be true, Clark took advantage of their fraternal relation and of the confidence which plaintiff reposed in him by reason of that relation. Though they had never met before that day, plaintiff's discovery that he and Clark were members of the same fraternal order was well calculated to inspire him with the same confiding trustfulness which one intimate friend may safely repose in another. It has been held that when men deal as friends, and one accepts as true false representations by the other, into which, but for the relation of friendship, he would have made inquiry, the law will protect him in his trust as certainly as it will deny him relief if the personal relations of the parties are such that the dealing is at arm's-length. (*Gray* v. *Reeves,* 69 Wash. 374 [125 Pac. 162]. See, also, *Dorr* v. *Cory,* 108 Iowa, 725 [78 N. W. 682], and *Grant* v. *Ledwidge,* 109 Ark. 297 [160 S. W. 200].) [9] For reasons equally cogent it must be held that when two men deal with each other as members of the same fraternal order, and one accepts as true the representations of the other, into which but for the fraternal relation he would have made inquiry, the law will protect him in his trust.

Moreover, plaintiff, an elderly gentleman of defective eyesight, would have experienced some difficulty in ascertaining the exact truth respecting this land. It is true he testified that by "feeling" the soil he could tell "whether it is good grape land or not." But to discover even in this crude manner that the soil of this 640-acre tract was not "good grape land" it doubtless would have been necessary for him to have felt the soil on more than one spot. And although he contented himself with a mere view of the land as he sat in the automobile which had conveyed him to the premises, he may have been led to make this superficial examination solely by reason of the character of the representations which were made to him by the man to whom he was bound

by fraternal ties. To discover the falsity of all the representations it would have been necessary for plaintiff to do more than merely "feel" the soil. He would have had to make a most careful examination of the property, and probably would have had to make inquiries of the neighboring land owners. But if the truth was more or less difficult of ascertainment by plaintiff, the facts were peculiarly within the knowledge of Clark, who was held out as one possessing special knowledge of the Association's properties, and who, as plaintiff knew, had exceptionally advantageous facilities for acquiring exact information. In *Smith* v. *Fletcher*, 102 Wash. 218 [173 Pac. 19, 636], it is said that "where facts are peculiarly within the knowledge of the vendor and difficult of ascertainment by the vendee, the vendee, who relies on the vendor's word, is entitled to rescind for misrepresentation as to material facts, although he may have inspected the land and made some investigation of the subject matter of the representations." See, also, *Rodee* v. *Seaman, supra; Hetland* v. *Bilstad,* 140 Iowa, 411 [118 N. W. 422]; *Koch* v. *Rhodes,* 57 Mont. 447 [188 Pac. 933]; *Best* v. *Offield,* 59 Wash. 466 [30 L. R. A. (N. S.) 55, 110 Pac. 17]; *Champneys* v. *Irwin,* 106 Wash. 438 [180 Pac. 405]; *Williams* v. *Hanna,* 105 Kan. 540 [185 Pac. 17], and *Manrel* v. *Shafer,* 135 Wis. 241 [115 N. W. 801]. In *Dow* v. *Swain,* 125 Cal. 683 [58 Pac. 271], Mr. Justice Temple said: "If the seller knows the facts, and the buyer is ignorant, and to the knowledge of the seller the buyer relies upon the representations, I see no reason why relief should not be granted, although an imperfect examination was made. It may have been imperfect because of the representations."

[10] 6. Plaintiffs are not estopped to complain of the fraud by reason of that provision in the written contract of sale which declares that the party named therein as vendor, C. I. Whitesell, and his attorney in fact, the Title Insurance & Trust Company, shall not be responsible for any representation not set forth in the contract. Whitesell executed the contract by his attorney in fact, and is referred to in the instrument as the vendor and as the party of the first part. The exact status of the title is not clear, but it seems to be conceded that the Association is the real

owner and that Whitesell was acting as its trustee. The clause in the contract upon which appellants rely reads: "It is further agreed that neither the party of the first part [Whitesell] nor the Title Insurance & Trust Company shall be responsible or liable for any inducement, promise, *representation*, agreement, condition or stipulation not set forth herein." (Italics ours.) By reason of the presence of this clause it is claimed that plaintiffs waived the fraud.

This provision of the contract—even if we assume that, if valid, it could redound to the benefit of the Association—was not a waiver of plaintiffs' right to maintain the action. The fraud which was the inducing cause of the execution of the contract renders the whole instrument vulnerable—the clause in question as well as all the other provisions. (*Watson* v. *Duarte,* 62 Cal. App. 52 [215 Pac. 1039]; *American National Bank* v. *Sommerville,* 191 Cal. 364 [216 Pac. 376].) "False and fraudulent representations made by one party to a contract, by which the other party is induced to enter into the contract, render it voidable at the election of the defrauded party, and a stipulation in such a contract to the effect that the false and fraudulent representations by which the one party induced the other to enter into it shall not affect its validity is itself of no validity. No one can be estopped by anything contained in an instrument which instrument was itself obtained from him by fraud and deceit." (*Hofflin* v. *Moss,* 67 Fed. 440, 444 [14 C. C. A. 459].) The chain cannot be stronger than its weakest link. The clause which it is claimed estops plaintiff to complain of the fraud cannot be made to survive the rest of the transaction as a shield and protection to defendants, whose false representations were the efficient and inducing cause of the contract. "Public policy and morality are both ignored if such an agreement can be given effect in a court of justice. The maxim that fraud vitiates every transaction would no longer be the rule, but the exception. It could be applied then only in such cases as the guilty party neglected to protect himself from his fraud by means of such a stipulation. Such a principle would in a short time break down every barrier which the law has erected against fraudulent dealing." (*Bridger* v. *Goldsmith,* 143 N. Y. 424 [38 N. E. 458].) Appellants have cited *Black-*

stad Mercantile Co. v. Porter & Co. (Tex. Civ. App.), 158 S. W. 216, as a case in point. There it was held that a provision in a written contract of sale that no statement by the seller's agent should be considered *a part of the agreement* unless written into the contract, bound the buyer, so that promises by the seller's agent, not made a part of the contract, did not bind the seller. But that would be true even in the absence of any such special provision in the contract. (Civ. Code, sec. 1625.) In the present case the party to whom the statements were made is not seeking relief upon the theory that the representations were a part of the agreement. Here the fraudulent misrepresentations which constituted the inducing cause influencing plaintiffs to enter into the contract were collateral to and not a part of the agreement.

[11] 7. The jury was warranted in finding that the false representations continued to influence the minds of plaintiffs after they had agreed to purchase the east half of the section and until their execution of the final contract. It was not incumbent upon plaintiffs to show by direct and positive evidence the continuing effect of the fraudulent representations as the inducing cause of the finally executed contract. "If a false statement was intended to be relied upon as an inducement to a given transaction which takes place within a reasonable time afterwards, it may well have a continuing operation on plaintiff's mind, and in the absence of proof to the contrary it cannot be said as a matter of law that he did not continue to rely on the statement." (26 C. J., p. 1165, sec. 76.) We may repeat, in passing, that the fraud was not discovered by plaintiffs until some time after the execution of the last contract.

[12] 8. The court did not err in refusing to strike out the evidence of those representations which appellants claim were not actionable. In *Haven* v. *Neal,* 43 Minn. 315 [45 N. W. 612], it is said that when representations which are matter of opinion and not of fact "are made in connection with others which are material as tending to establish the plaintiff's case, they should not be ruled out, but the entire statement should be received and considered together." (See, also, *Anderson* v. *Heasley,* 95 Kan. 572 [148 Pac. 738].)

9. The court erred in admitting evidence of certain preliminary documents preceding the signing of the instrument which plaintiffs claim was the corrected and final contract for the purchase of the entire section. The answer admitted the contract as pleaded in the complaint, except that it denied that the deferred installments were to be paid on July first of each year, and alleged that they were payable on the 28th of March of each year until fully paid. A written contract for the sale of the entire section, signed by all of the parties, was produced at the trial. It had been in the custody of the Association. The instrument showed that a line had been drawn through the words and figures "March 18," and that written over the canceled words and figures were the words and figures "July 1st." The trial of the case took place in the month of May, 1921. Respondents, assuming that *Hines* v. *Brode,* 168 Cal. 507 [143 Pac. 729], holds that the plaintiff in an action of this character must show that he has complied with all the terms of his contract up to the time of the trial, argue that it was necessary for them to establish the payment by them of any installment of the purchase price which fell due prior to the trial. Upon this false premise it is further argued by respondents that since none of the deferred installments had been paid by them up to the date of the trial, it was incumbent upon them to show that under the terms of the contract as finally executed the first deferred installment was payable in July, 1921, and not in the month of March of that year. There is no merit in the contention. [13] One induced by fraud to enter into a contract for the purchase of real estate may withhold payments after the discovery of the fraud and pending the action for damages. True, the plaintiff in such an action must be willing and able to pay if and when he shall become liable therefor (*Hines* v. *Brode, supra*); but the fraud suspends liability to make payments accruing after discovery of the fraud and pending the action. Payments may be withheld to recoup such damages as may be recovered. (*Pembrook* v. *Houston,* 41 Cal. App. 54 [181 Pac. 828]; see, also, *Webb* v. *Emerson etc. Co.* (Tex. Civ. App.), 227 S. W. 499, and cases there cited.) In *Hullinger* v. *Big Sespe Oil Co.,* 50 Cal. App. 10 [194 Pac. 742], the supreme court, in denying a petition to have

the cause heard by it after judgment of the district court of appeal, said that it did not approve that part of the opinion of the latter court which declares that it is essential for the plaintiff in an action for damages on the contract to allege and prove his willingness and ability to perform the contract according to its terms.

[14] Moreover, the preliminary documents, though tending to show *why* the parties signed the instrument which plaintiffs claim was the final and accepted contract, do not prove or tend to prove its due execution. If the time when the first deferred payment fell due had been material, that is, if it had been necessary to show that the first installment would become due subsequent to the trial of the action, i. e., in July, and not in March, that fact could have been established by evidence that the changes in the final instrument were made before the Title Insurance & Trust Company signed it for and in the name of its principal, C. I. Whitesell, and that the signing of the instrument was followed or accompanied by delivery as the remaining essential to due execution. But evidence which merely showed *why* it was that the parties intended to enter into such a contract as is evidenced by the instrument last to be signed by them did not tend to establish that instrument, in its corrected form, as the finally executed contract.

Nor can we say that the improper admission of this immaterial evidence did not injure defendants. The circumstances were such that the evidence may have created a suspicion in the minds of the jurors that the officers of the Association were fraudulently seeking to impose upon plaintiffs a contract other than the one upon which the parties had agreed.

[15] 10. The letter of December 29, 1920, from the Association's secretary to plaintiff was improperly admitted in evidence. Respondents claim that this letter was admissible in order to show an acceptance by the Association of what plaintiffs claim was the finally executed contract. There is nothing to warrant the inference that by his allusion to the "contract" the writer of the letter intended that the reference should be to the instrument last signed by the parties. The reference may just as well have been to the next preceding written instrument—the instrument which provided for the payment of the installments in the

month of March. Moreover, no foundation was laid for the introduction of the letter by showing authority in the secretary to say which one of the instruments was accepted by his principal as its final contract with plaintiffs.

[16]   11. Another error, and one which we believe must have seriously prejudiced defendants' case in the minds of the jurors, was the admission of the testimony of neighboring farmers as to the meager crops raised by them on their lands. Evidence of this kind, injecting collateral issues into a case, should be received with caution, and then only when it is obvious to the court, from the similarity of conditions, that it affords a safe and reliable standard of comparison. (*Converse* v. *Ferguson,* 166 Cal. 1 [134 Pac. 977]; *Fairbanks, Morse & Co.* v. *Zimmerman,* 30 Cal. App. 81 [157 Pac. 509]; *People* v. *Wagner,* 29 Cal. App. 363, 368 [155 Pac. 649]; *Patrick* v. *Howard,* 47 Mich. 40 [10 N. W. 71]; 1 Wigmore on Evidence, pp. 522, 523.)   The results which these witnesses obtained from the farming of their lands could afford no logical basis for the inference that better results could not be obtained from the proper farming of section 13 unless it were shown that the soil of section 13 and the soils of these near-by lands were substantially alike in texture, structure, chemical content, and composition. Some of the witnesses in the case testified that the lands in that vicinity, as well as those in the Imperial Valley generally, are very "spotted," and that no two pieces are alike. Before the crops raised by these neighboring farmers on their lands could be taken as a safe criterion whereby to judge the character of the soil on section 13 it would be necessary to show, in addition to similarities of soil texture and chemical content, that the lands were leveled in a similar manner; that they were brought to the same pitch or fall so as to be similarly affected by the artificial irrigation practiced in that desert region; that section 13 and these other lands had been prepared for crops by the same kind and degree of cultivation and treatment, exhibiting the same methods of husbandry; that the crops were planted at the same seasons and under the same weather conditions, and were irrigated in practically the same manner and for the same periods of time. These are some of the essential elements of similarity which it would be necessary to show

before the court could properly receive the evidence of these neighboring farmers as to the results obtained by them from the farming of their lands. Unless these elements of similarity exist there is no just or fair standard of comparison. No attempt was made to show such similarity of conditions, notwithstanding the burden rested upon plaintiffs to make a satisfactory showing thereof. (22 C. J., p. 753.)

Respondents seek to justify the admission of this evidence upon the theory that it tended to establish the falsity of a representation in the folder as to what "other farmers are doing"—referring to a statement in the folder wherein the Association speaks in glowing terms of the successes achieved by other farmers in the district. But respondents' right of recovery must be based upon representations respecting the character of the particular parcel of land which they purchased. They cannot recover for the falsity of representations which affect other lands only. Moreover, evidence of what could or could not be done with lands in the immediate vicinity of section 13 does not tend to disprove the very general statements in the folder as to what "other farmers" were doing.

We can readily see how the admission of this improper evidence must have been prejudicial to appellants in a substantial measure. Without doubt, it must have been considered by the jury and must have had some weight with them in their determination of the value of the land sold to plaintiffs; and thus it must have had a tendency to enhance the jury's award of damages. This is so for the reason that in cases of this kind the measure of damages ordinarily is the difference between the actual value of the property sold and the value which it would have had if it had been as represented. (*Hines* v. *Brode, supra.*) If follows, therefore, that, the value which the property would have had if the representations were true being determined, the amount of damages awarded to the party complaining of the deceit will decrease or increase *pari passu* with the rise or fall of the property's actual value as determined by the jury. That is to say, other things being equal, the lower the actual value the greater the difference between it and the value which the land would have had if it had been as represented. The testimony as to the results obtained from

the farming of neighboring lands must have had a strong tendency to depreciate, in the estimation of the jury, the actual value of the land in section 13.   To the extent that it did so, this improperly admitted evidence must have tended to increase the amount of the verdict.   Without doubt, therefore, it was prejudicial to appellants' case; and if there were no other error, the improper admission of this testimony would alone necessitate a reversal of the judgment and a retrial of the action.

[17]   12. We do not think plaintiffs' instruction No. 2 is objectionable upon the score that it fails to single out the false representations that were material and separate them from those which appellants claim were but expressions of opinion and immaterial.   For reasons already stated we are of the opinion that each of the representations specifically referred to in the instruction was material and actionable. And even if one of them were not material we probably should hesitate to reverse the judgment for that reason alone.   (See *Anderson* v. *Heasley, supra.*)

[18]   13. By plaintiffs' instruction No. 4 the court charged the jury that it is not necessary to prove by direct or positive evidence the intent to deceive, but that it is sufficient to prove facts from which such intent may be drawn—that the intent to deceive may be inferred from circumstances in evidence.   This is a correct statement of the law.   The intention of the parties cannot often be proved by direct testimony, but may be established by inference from the acts of the parties.   (27 C. J., p. 70, *Rochford* v. *Barrett,* 22 S. D. 83 [115 N. W. 522].)

[19]   14. By the last clause of this same instruction the jury was advised that one has a right to rely upon the representations or statements of another in purchasing property when the other is held forth as an expert.   It is claimed by appellants that a buyer is warranted in relying upon the representations of a vendor who has expert knowledge of the subject matter of the sale when, and only when, there has arisen a legal fiduciary relationship between the parties. The contention lacks merit.   If the vendor holds himself out as an expert possessing superior knowledge of the subject matter of the sale, and the vendee does not possess such expert knowledge, and if the latter, during the preliminary

negotiations, expressly reposes confidence in the vendor's supposed superior knowledge as an expert and gives the latter to understand that he is going to rely upon the truth of his representations, he may safely rely thereon irrespective of whether there is or is not a legal fiduciary relation between the two; and the confidence thus reposed by the vendee must not be abused. (*Grant* v. *Ledwidge, supra.*)

[20] 15. By plaintiffs' instruction No. 9 the jury was advised, and properly advised, that the measure of damages in cases of this character is the difference between the actual value of the property and the value which it would have possessed had it been as represented. But in this same instruction the court gravely erred, so far as the rights of the Association are concerned, when it told the jurors that if they found for plaintiffs they should not deduct from the total amount of damages any unpaid portion of the purchase price but should assess the damages irrespective of any unpaid balance. " . . . in case of an executory contract, from the award which the jury may make because of the fraud, must be deducted the unpaid part of the purchase price or the value of any other consideration. *And to this effect the jury should be instructed.*" (*Hines* v. *Brode, supra.*) (Italics ours.) Where, as in this case, the amount of the purchase price remaining unpaid exceeds the sum awarded as damages, it would be unjust to the vendor if he were compelled to pay the full amount of damages and thereafter be required to resort to a separate action for the recovery of the unpaid portion of the purchase price in the event that his vendee, after the judgment for damages had been satisfied, should be unable or unwilling to carry out the terms of his contract.

[21] 16. Complaint is made of the modification of an instruction requested by appellants—defendants' instruction No. 22. The instruction, as prepared by defendants, advised the jury that plaintiffs cannot recover if they had the means of investigating the facts and did not do so, or if the circumstances attending the transaction were such as to put plaintiffs upon inquiry and they did not make any inquiry. The court gave the instruction as requested after modifying it by adding thereto the following: "Unless you further find that plaintiffs were induced to refrain

from investigation by acts and statements of the defendants." Considered as an abstract proposition, this modification is subject to the criticism that it fails to describe the nature of the acts or statements which will excuse inquiry or examination where inquiry or examination would otherwise be essential. It is not every act or statement of a vendor which will excuse a vendee's neglect to make an examination or investigation where the parties are dealing at arm's-length and with equal means of knowing the truth, and the representation is as to the value of the land, its condition, quality, or adaptability for particular uses. Here, if the allegations of the complaint and the testimony of plaintiff and his witnesses be true, plaintiff and defendants were not standing upon an equal plane of vantage, with equal means of knowing the truth, and the representations were made under such circumstances as to disarm caution and lull plaintiff's suspicions. But if the jury believed otherwise, that is, if it believed that plaintiff and the defendants were in fact standing upon an equal footing and did have equal means of knowing the truth and that the representations were not made under such circumstances as to disarm the vigilant and lull his suspicions, then, and in that case, it would not be true that an act or statement of defendants would excuse plaintiff's failure to make an examination or investigation irrespective of whether such act or statement was or was not fraudulent, i. e., done or said with the fraudulent purpose of inducing plaintiff to forego making an examination. **[22]** The rule is that where the parties stand upon an equal footing and have equal means of knowing the truth, and the vendee's suspicions are not lulled by the nature of the representation, an examination by the buyer will be excused only when he is *fraudulently* induced to forego examination, or where trick or artifice has prevented him from doing so. (*Parker* v. *Moulton,* 114 Mass. 99 [19 Am. Rep. 315]; *Gustafson* v. *Rustemeyer, supra.* See, also, 26 C. J., p. 1157; 12 R. C. L., p. 384, and *Koch* v. *Rhodes, supra.*)

**[23]** 17. Objection is made to plaintiffs' instruction No. 6, whereby the court advised the jurors that they might "consider whether plaintiff was put upon inquiry or whether he was *lulled* into a reliance upon any representations made

at the time of the sale.'' It is claimed that by the use of the word ''lulled'' the instruction implies the use of improper means to prevent inquiry and an examination by plaintiff. But under the circumstances of this case, as testified to by plaintiff and his witnesses, one of the consequences of Clark's representations was to disarm plaintiff's vigilance and to lull his suspicions. (See *Stewart* v. *Stearns,* 63 N. H. 99 [56 Am. Rep. 496].)

[24]   18. Appellants justly complain of the court's refusal to instruct the jury that in determining the fair market value of section 13 they should not consider whether land of similar character could have been purchased at a lower price in other localities. The prices at which other lands of like quality and adaptability and similarly situated could be purchased do not constitute a proper standard for ascertaining the actual value of the land in question. (*Reclamation District* v. *Inglin,* 31 Cal. App. 495 [160 Pac. 1098].) The owners of such other lands, through force of circumstances beyond their control, might be willing to sell their lands at prices below their actual value, or they might be willing to make such sales through improvidence or want of good judgment. That the jury, in arriving at the actual value of the land sold to plaintiffs for the purpose of determining the amount of damages which should be awarded, was probably influenced by this improperly admitted testimony as to the prices at which other lands could be bought is indicated by the fact that the jurors themselves, or some of them, separately asked several witnesses about the prices of other lands. This testimony, it is true, was brought out on cross-examination, but that fact did not excuse the court's refusal to give the requested instruction or an instruction covering the same subject. [25]   As cross-examination, the testimony as to the prices at which other similar lands could be bought was proper for the purpose of testing the witnesses' knowledge and impeaching their opinions, but not for the purpose of fixing the value of the land; and the jury should have been so advised, particularly in view of defendants' requested instruction.

The judgment is reversed and the cause is remanded.

Works, J., and Craig, J., concurred.