[Civ. No. 2614.  Third Appellate District.—October 18, 1923.]

## ROSELLA STONE et al., Respondents, v. H. E. McCARTY, Appellant.

[1] FRAUD — PURCHASE OF LAND — CHARACTER AND PRODUCTIVITY OF LAND—STATEMENTS OF MATERIAL FACTS.—A statement made by a vendor to a vendee as to there being no hardpan in the land, which was the subject of sale, was a statement of a material fact affecting the fertility of the land in question and also of its capacity to raise trees or produce crops of commercial value; and statements also made by the vendor in relation to orange trees and the price for which they had and were being sold constituted material inducements for entering into the agreement of purchase as well as the fact that the trees were budded stock which added to their commercial value and would necessarily be considered by anyone in making purchase thereof.

[2] ID.—RESCISSION BY VENDEE—LACHES.—In an action by vendees for rescission of a contract of purchase of land on the ground of fraudulent representations made by the vendor and his agent as to the character and productivity of the land, the condition of trees and the price they could sell for, the plaintiffs were not guilty of laches in effecting a rescission where a period of not over two months elapsed between the time when the plaintiffs discovered the fraud and the rescission of the contract and offer to restore the premises were made by plaintiffs, and no material injury was shown to have been suffered by defendant on account of any delay on the part of plaintiffs in effecting a rescission.

[3] ID.—LACHES—PLEADING—PROOF.—Laches is a defense and not a condition of relief, and, if it does not appear on the face of the complaint, must be affirmatively pleaded and proven.

[4] ID.—EVIDENCE—REPRESENTATIONS.—In such action, where it appeared that plaintiffs expended certain sums of money for improvements and on account of the purchase price, that they were not familiar with the country in which the land was situated, knew nothing of the soil, knew nothing of orange trees, stated explicitly that they relied upon the honesty of the defendant and his agents, were informed that the land was free from hardpan,

1. Representations by vendor as to quality or condition of soil, note, L. R. A. 1917C, 273.

2. Effect of delay as waiver of purchaser's right to rescind contract for purchase of real property, notes, 1 Ann. Cas. 911; 30 L. R. A. (N. S.) 872.

had standing upon it budded trees of a stated salable value, that the defendant had been selling the trees therefrom at a certain price each, whereas in fact the jury and court found from the testimony, which they had a right to believe, that none of these representations was true, that the plaintiffs relied upon such representations and statements and were induced thereby to purchase the premises, all these circumstances bring the case within the provisions of subdivision 1 of section 1572 of the Civil Code, to wit: "The suggestion, as a fact, of that which is not true, by one who does not believe it to be true."

APPEAL from a judgment of the Superior Court of Sacramento County. Charles O. Busick, Judge. Affirmed.

The facts are stated in the opinion of the court.

W. E. Kleinsorge for Appellant.

Mark L. Burns for Respondent.

PLUMMER, J.—The action was brought by plaintiffs for rescission of a certain contract or agreement for the purchase of fifteen acres of land situated, lying, and being in the county of Sacramento, state of California, made and entered into between the plaintiffs and the defendant on or about the ninth day of April, 1921. Cause of action, fraud and misrepresentations. The action was tried before the court sitting with a jury. The jury found in favor of the plaintiffs, the court approved the verdict of the jury, made findings of fact, drew its conclusions of law and entered judgment in favor of the plaintiffs for the cancellation of the contract referred to for the return of the sum of $1,000 paid by the plaintiffs on account of the purchase price of said land and also for the further sum of $600 damages suffered by the plaintiffs. The points tendered for consideration on this appeal are, first: Are the findings supported by the evidence; second, is the judgment supported by the findings? After finding the facts relating to entering into the agreement of purchase and price to be paid therefor, the court found as follows:

"That on or about the twentieth day of March, 1921, while said plaintiff and defendant were considering the aforesaid agreement and before the making thereof, defendant, H. E. McCarty, and his agent, W. A. DeSota, for the purpose of

inducing said plaintiff to enter into said agreement to purchase the aforesaid property, among other things, represented to plaintiff, Rosella Stone, that the nursery trees growing on said land were of the value of Fifteen Hundred ($1,500.00) Dollars, and that said trees would soon be ready for market and were already budded, and, if they were properly irrigated the coming season, said plaintiff, Rosella Stone could easily and readily sell same for not less than Fifteen Hundred ($1500.00) Dollars; and among other statements made by defendant, H. E. McCarty, and his said agent, was that the soil was sandy loam soil, and was from five to six feet in depth and was particularly adapted to the growing of peach, apricot and all kinds of fruit trees, and that the pump aforesaid mentioned was sufficiently large to pump water to irrigate all of said land; and defendant further stated that during the rainy season of the year the said land was free of pools of water and reasonably dry and absorbed all the moisture.

"That plaintiff, Rosella Stone, relying upon the aforesaid representations, and believing them to be true, was induced thereby to enter into the aforesaid agreement with defendant, and, so relying upon said representations, did, on the ninth day of April, 1921, purchase and buy from defendant the aforesaid tract of land, together with the aforesaid personal property, and then and there paid to defendant the sum of One Thousand Dollars of the present standard of value, and then and there entered into the aforesaid agreement to pay to defendant the balance of the purchase price of Forty-five Hundred Dollars, to wit: Five Hundred Dollars on or before the ninth day of April in every year hereafter until the total purchase price was paid for in full, together with interest on balance due on principal from date, at the rate of six per cent per annum, payable annually. That thereafter, to wit: On or about the 25th day of May, 1921, the plaintiffs moved on, and took possession of, the aforesaid land and premises, and commenced to irrigate, cultivate and improve, a portion of the same; that, during their said residence on said premises, plaintiffs, still believing the aforesaid representations of the said defendant H. E. McCarty, and his agents, Roy Brooke and W. A. DeSota, to be true, and that the soil was from five to six feet deep, and of good quality for peaches, apricots and other kinds of

fruit trees, and that the soil was a deep loam, and that the nursery trees were all budded and were of the value of Fifteen Hundred Dollars, and that the pump was sufficiently large to pump water to irrigate the entire tract of land, proceeded to plow and level the land and irrigate the fruit trees, repair the dwelling-house on said premises and buying oil and gas for the pump and were getting the place in condition to be set out in trees and farm in a farm-like manner.

"That during the month of September, 1921, plaintiffs discovered that all of the aforesaid representations made by the defendant H. E. McCarty and his agents, Roy Brooke and W. A. DeSota, to plaintiff, Rosella Stone, were false and fraudulent and were known or ought to have been known by defendant and his said agents at the time they were made, to be false and fraudulent, and were made by said defendants for the purpose of inducing plaintiff, Rosella Stone, to enter into said contract.

"That on account of the fraudulent representations made to said plaintiff, Rosella Stone, by defendant H. E. McCarty and his agents, Roy Brooke and W. A. DeSota, said plaintiffs have been damaged in the following sum, to wit: Six Hundred ($600.00) Dollars.

"That said plaintiffs, as soon as they discovered the falsity of the aforesaid representations, gave and served a notice of rescission of said contract on said defendant, and for that purpose said plaintiffs made a good and sufficient quitclaim deed for the conveyance of the land and premises aforesaid to the defendant, and on or about the tenth day of November, 1921, and before the commencement of this action, they tendered the said deed to defendant and offered to give the defendant the full and peaceable possession of said premises and of all personal property heretofore delivered to said plaintiff by defendant as aforesaid, and said plaintiffs then and there demanded of defendant the repayment by him to said plaintiffs, of the sum of One Thousand ($1,000.00) Dollars, part of the purchase price paid to defendant by said plaintiff as aforesaid, and also demanded the payment of $945.50 for money expended on improvements and taking care of the premises, and for expenses of moving on said premises, and demanded of defendant the cancellation of their said agreement to purchase, made and executed by said plaintiff as aforesaid, but to return to plaintiffs the said

sum of One Thousand Dollars, or to accept said quitclaim deed, or to pay said damages, the defendant refused and still refuses."

The testimony shows that plaintiffs were desirous of buying a small tract of land suitable for raising fruits of various kinds. That the transaction relative to the purchase of the tract of land on the part of the plaintiffs was conducted by Rosella Stone. That just preceding the purchase of the land in question the plaintiffs were living in the town of Colusa engaged in the rice business. That the plaintiff noticed an advertisement in the "Sacramento Bee" of a small place for sale in the Natomas district and thereupon entered into correspondence with the Brooke Realty Company in regard to the place, and upon calling on the Brooke Realty Company was informed by Mr. DeSota, an agent of the company, that the place had been sold, but that they had two other very nice little places, one about two miles above Perkins and the other half a mile on the other side of the Western Power house. "Mr. DeSota asked me if I was acquainted out in the country of Sacramento; I said, No, I was just acquainted in the city." After lunch DeSota and the witness, Rosella Stone, started out on the Placerville highway. On the way DeSota asked if the plaintiff, Rosella Stone, had ever been out in that part of the country. Her remark was that she had been out once in Fair Oaks, but did not know the direction and was not familiar with the country.

"DeSota asked me who took me out to that part of the country; I told him Trainor & Desmond. He asked me, 'Did you like Fair Oaks?' I replied: 'Well, some parts of it I liked and some parts I did not like.' He says: 'Did you like the places he showed you?' I said: 'No, one place I did not like—I did not have the money to buy the other place, too much bedrock.' He says: 'They are a bunco crowd anyway; they are all buncoing.' We came down to this little place above Perkins. I did not like the place. DeSota says: 'Well, we will go back to the Western Power plant to Mr. McCarty's place.' I asked: 'What is this Mr. McCarty's place?' He says: 'There is a five-room bungalow that has to be finished. Anyone that buys the place has got to finish the house. There is a pumping plant, a woodshed, a kind of a storeroom, a small barn, a garage on one

side,' and he said it was an old nursery, he says 'a very valu-
able stock of nursery trees on it, orange and lemon trees,
all budded ready for market.' He says: 'They are worth
fifteen hundred dollars.' I asked him what Mr. McCarty
asked for the place; he said he did not know; we drove up
the road and went into Mr. McMcCarty's place—so we
walked in opposite the orange and lemon trees, Mr. DeSota
called my attention at the time, asked me if I saw those
trees. I said: 'Yes.' He said: 'That is just like getting fif-
teen hundred dollars to buy that place.' We walked in, and
Mr. McCarty was in the back yard; Mr. DeSota introduced
me to him, and told Mr. McCarty I was looking at the place.
Mr. McCarty asked me if I would like to go in the house. I
says: 'Yes, I would like to look at the house.' So I went in
the house, and Mr. McCarty introduced me to Mrs. McCarty,
and Mr. DeSota and Mr. McCarty stayed out in the kitchen,
and Mrs. McCarty took me around the house, showed me the
house. When we came back in the kitchen, I says: 'Mr. Mc-
Carty, now, I would like to ask is this land level?' Mr.
McCarty says: 'Oh, yes, this land is all nice and level.' . . .
Mr. McCarty asked me if I wanted to see the place: 'We
can walk down across and see the land.' Mr. DeSota and
Mr. McCarty and I walked down that ditch. Mr. McCarty
pointed out the corners around where the stakes were with
red flags, and I requested to see the pump, and we went
back to the yard again and we looked at the pumping plant;
we looked at the barn; we looked at the garage; we walked over
to the orange trees. I says: 'Mr. McCarty,' I says, 'Are those
trees salable?' He says: 'Yes, they are salable for one dollar
and a half apiece.' I says: 'Are they all budded?' He says:
'Yes, we take them to the free market and sell them down there
every morning; we get one dollar and a half apiece for them.'
I says: 'Mr. Stone is a grain farmer and does not know abso-
lutely nothing about trees.' I says: 'I am depending upon you.'
Then I asked him about hardpan. He says the soil was six
feet deep. I asked Mr. McCarty to get a shovel that we could
dig down. Mr. McCarty said he was not able to get down,
he had the rheumatism. I says: 'Well, Mr. De Sota is a
big, strong man, he could dig for him.' Mr. McCarty said
he did not have any shovel; he would have to get one from
the neighbors. He says: 'Come over here to the front yard,
I can show you.' So we walked over to the front yard and

it was all nice, sandy loam in the front yard. I made the remark to Mr. McCarty and Mr. DeSota that I would have to depend on their honesty if we bought the place; that my husband had sent me alone, I did not know anything about buying land; I would have to depend on their honesty. Mr. DeSota raised up his hand, he said: 'Mrs. Stone, we have been in business for twenty years in Sacramento,' he says, 'We respect the name and our place of business too much to misrepresent this small piece of land of fifteen acres.' He says: 'We can't generally handle small pieces like fifteen acres,' he says that 'Mr. McCarty is very sick and has been ordered by his physician to go to Europe, and we are handling that land.' I says: 'Well, we have not got very much money, it will be a serious proposition to buy a proposition like this.' Mr. McCarty says: 'There is no trouble about the money, about making your payments with those orange trees here.' I says: 'Well, that is all we have to depend on were the orange trees.' I says: 'We have not any money, it will be three years before they get to raising of any value on the place.' He says: 'Mrs. Stone, I will guarantee you will never be sorry if you buy the place.' I says: 'I am going down to Stockton, I will consider the matter over.' We started, went back and got in the automobile, when we got started back I says: 'Now, Mr. DeSota,' I says, 'Now, I want you to tell me the truth about this piece of land, I am a woman, I have not any experience in buying a place—I want to satisfy my husband.' He says, 'Mrs. Stone,' he says, 'You will never be sorry if you buy that place, you take that place and set it out in peaches and apricots, and in two years I will get you ten thousand dollars for the place.' He asked me if I wanted to put a deposit. I says: 'No, I am going down to Stockton, I will consider the matter over.' He says: 'When you get ready and you want to come, you call me up at my expense.' I says, 'Yes, I will.' I went down to Stockton next morning. On Saturday evening I called Mr. DeSota up at his expense, as he wanted me to do. I asked him if the place was sold. He says: 'No,' he says, 'there is a party had looked at it.' He says: 'You better come immediately, they might buy it.' I says, 'I will come in the morning.' . . . He says: 'The train gets in Sacramento about 9 o'clock; I will be waiting for you at the office.' He says: 'Come to the office, will you?' I says:

'Yes.' I went to the office; Mr. DeSota was waiting, as he had promised over the telephone. We got in the car and drove out to the McCarty place. We had to leave the car out on the road again and walk in. Mr. DeSota made the remark that Mr. McCarty was not up yet, so we walked around the house and knocked at the door. Mr. McCarty came to the door, he did not recognize me; Mr. DeSota says to Mr. McCarty, 'This lady wants to see the place again.' McCarty says: 'Will you step in? My wife has not got her work done up.' I says: 'I will look the house over.' I went in. Mr. DeSota and Mr. McCarty went out in the back yard, had a little private talk—in the meantime, he came up, I asked Mr. DeSota if he had seen Mr. McCarty since the last time we looked at this place. He says: 'No, I have not seen Mr. McCarty since you were here.' He says: 'Mr. McCarty had a private conversation with Mr. DeSota''—they went out and talked; I walked over to a little porch, and Mr. DeSota came over to the porch and Mr. McCarty says: 'Mrs. Stone, I am very glad you can take that place.' I told them I had to rely upon their honesty in buying that place. Mr. DeSota told me again, he says: 'Mrs. Stone, we have respect for our name too much.' I says: 'I have got to depend on their honesty, I did not know anything about buying.' I asked Mr. McCarty about the orange and lemon trees, he said they were all ready for the market, all we had to do was to take them, to irrigate them in the summer, we could sell them for one dollar and a half apiece. We went back to Sacramento. After I got back to the office I said to Mr. DeSota, 'Now,' I says, 'Mr. DeSota, now, tell me the truth again; do you think I am making a mistake in buying that place?' He said: 'No, Mrs. Stone, you are not, you will never be sorry for the money you put in that place, because,' he says, 'I can get you, after you set it out in peaches and apricots, and repair that house, I will get you ten thousand dollars for the place inside of two years.' I put up a deposit of one hundred dollars. He said he would get Mr. McCarty in town, fix up the papers, he would notify me and my husband, and we could come down from Colusa and sign the papers. Mr. DeSota had promised me faithfully he would be present when the deal was closed, and I went in Brooke's office, so I went up about 11:30, so I saw another man sitting back of the counter. I says: 'Is Mr. DeSota

in?' He says: 'Is this Mrs. Stone from Colusa?' I said: 'Yes.' He says: 'Mr. DeSota is not in.' I says: 'When will Mr. DeSota come in?' He says: 'About 4 o'clock this afternoon.' I felt awfully disappointed because he promised me he would be here when the deal was closed. The gentleman said: 'Mrs. Stone, I am Roy Brooke; I know all about this deal,' he says, 'The papers are all written,' he says, 'I can close the deal.' Mr. Brooke asked me to sit. I sat down. So, Mr. McCarty was in there; he came and talked to me. I says: 'I asked Mr. Brooke, what do you know about this land out there?' He says: 'Mrs. Stone, I know that to be a very fine piece of land.' I says: 'What do you know about those orange and lemon trees?' He says: 'I know Mr. McCarty has made big money, made about fifteen or sixteen hundred dollars selling trees.' I says: 'How about the hardpan?' He says: 'There is no hardpan out there.' I says: 'My husband was very careful about getting in the Florin district; we have friends over there, they are always talking about their hardpan.' He says: 'Well, you are fifteen or sixteen miles from Florin; there is no water standing on the place.' I says: 'That is what Mr. McCarty and Mr. DeSota told me when I was there, that there was no water there; just observe the moisture.' Mr. McCarty came in and we closed the deal.''

There was further testimony introduced tending to show that the hardpan underlying the fifteen acres was anywhere from two inches to two feet from the surface and other witnesses testified it was from eight inches to two feet, three feet or four feet. The testimony also shows that the sandy loam to which the attention of the plaintiff, Rosella Stone, was called and which was examined by her at the request of the defendant in company with Mr. DeSota was a small tract or parcel on which had been spread some twenty-five loads of sandy soil hauled there by a Japanese in order to enable him to raise vegetables. It also appears from the transcript that there was a sharp conflict of the evidence as to the statements and representations made by McCarty, DeSota, and Brooke, but the verdict of the jury and the findings of the court are conclusive upon appeal. The jury and the court had a right to believe the witnesses for the plaintiffs, render a verdict and make findings accordingly. At the conclusion of the plaintiff's testimony, the defendant made a motion for

nonsuit. This motion was denied. The court's action in this particular is also assigned as error.

It is strongly insisted by appellant that the statements made by the defendant and his agents, if made, were merely expressions of opinion and were not such as to amount to fraudulent representations under the law and were not of such a character as to give rise to the cause of action herein, even though false. A number of cases are cited giving instances in which the courts have held representations to be merely matters of opinion in reference to the value, etc., of property. However, the recent case of *Scott* v. *Delta Land & Water Co.*, 57 Cal. App. 320 [207 Pac. 389], answers such contentions very clearly. The representations there made were that the land "was of the best quality, fertile in every respect, free from alkali and noxious weeds, and suitable for growing thereon all kinds of crops of hay, grain and vegetables; that the Delta Company owned all of the water flowing in the Beaver River and that, according to the record kept by the United States government for fourteen years, that river furnished sufficient average flow to irrigate 44,000 acres of land etc." Other representations were made which are not material to be here set out. It was there held that the judgment may be sustained upon evidence supporting any one of the material representations set out in the complaint. To the same effect are *Davis* v. *Butler*, 154 Cal. 623 [98 Pac. 1047]; *Thomas* v. *Hacker*, 179 Cal. 731 [178 Pac. 855]. And also held that "the representations as to the productive quality of the soil and as to the adequacy of the water supply were material factors which, if they furnished an inducement to the vendees to enter into the contract made by them, would afford ground upon which to base a rescission when their falsity was established." (Citing *Bickel* v. *Munger*, 20 Cal. App. 633 [129 Pac. 958]; *Tracy* v. *Smith*, 175 Cal. 161 [165 Pac. 535].) Also that "misinformation as to the material matters referred to would constitute representations as to existing facts and conditions, and would not fall within the category of mere opinion or speculation." [1] In the case at bar the statement as to there being no hardpan was a statement of a material fact affecting the fertility of the land in question and also of its capacity to raise trees or produce crops of commercial value. Statements also made in relation to the orange trees and the

price for which they had and were being sold constituted material inducements for entering into agreement of purchase as well as the fact that the trees were budded stock which added to their commercial value and would necessarily be considered by anyone in making purchase thereof.

It is further insisted that the plaintiffs are guilty of laches and are not entitled to recover, even though the representations were material and were all made as found by the court and the jury. An examination of the record fails to disclose that this question was brought to the attention of the trial court either by demurrer or answer, nor is there anything in the transcript which shows that the defendant suffered material injury on account of any delay on the part of plaintiffs in effecting rescission. The testimony shows and it is found by the trial court that the plaintiffs discovered the frauds complained of during the month of September, 1921. That the defendant was notified thereof some time during the month of October of that year and that thereafter on or about the tenth day of November the plaintiffs gave their notice of rescission and tendered back the premises to the defendant, which offer was declined. It thus appears that a period of not over two months elapsed between the time when the court found that the plaintiffs discovered the fraud that had been practiced upon them and the rescission of the contract and offer to restore made by the plaintiffs.

[2] The complaint in this action upon its face does not appear to the court to show laches nor is there anything in the testimony from which we can conclude that the plaintiffs were negligent in effecting the rescission or allowed any unreasonable time to elapse. Certainly two months is not an unreasonable length of time when there is nothing to show that the defendant has thereby suffered material injury.

[3] It is also insisted by the appellant that the defense of laches need not be pleaded and that a court of equity will act upon this question without any pleading. (Citing *Harris* v. *Hillegass*, 66 Cal. 79 [4 Pac. 987]; *Bell* v. *Hudson*, 73 Cal. 289 [2 Am. St. Rep. 791, 14 Pac. 791]; *Sullivan* v. *Portland etc. R. R. Co.*, 94 U. S. 806, 811 [24 L. Ed. 324, see, also, Rose's U. S. Notes]; *Hagerman* v. *Bates*, 24 Colo. 80 [49 Pac. 139]; *Coon* v. *Seymour*, 71 Wis. 346 [37 N. W. 243].) These cases, however, are not in accord with the later cases decided by the supreme court of this state. In

the case of *Victor Oil Co.* v. *Drum*, 184 Cal. 226 [193 Pac. 243], in a very exhaustive opinion written by Justice Olney, it is said: ''As to the defense of laches, the complaint, as we have stated, was not filed until nearly a year after the date at which it alleges a discovery was had. The defendants furthermore contended that as early as 1912 an investigation was started resulting in a report in April, 1913, disclosing facts sufficient to charge the plaintiff with a discovery as of that time. It is not necessary to consider the accuracy of this contention. If it be true, the discovery was still within the period of limitation. Mere delay in bringing an action for a time less than the period of limitation does not amount to laches. There must be also present the element that the delay has been to the prejudice of the opposite party. Citing a number of cases. . . . We might also add that laches is a defense and not a condition of relief, and, if it does not appear on the face of the complaint, must be affirmatively pleaded and proven by the defendants. (16 Cyc. 176.) In the present case there was neither pleading nor corresponding proof of any prejudice suffered by the defendants through the delay of the plaintiff in not commencing its action more promptly upon the discovery of the fraud.''

In *Tracy* v. *Smith*, 175 Cal. 161 [165 Pac. 535], it is said: ''The question of plaintiff's laches as a defense was not raised in the trial court, and hence should not, for the first time, be urged here. Indeed, objection to the rescission on that ground, since not pleaded, is deemed waived.''

As to the question whether the damages allowed were excessive it is sufficient to state that an examination of the testimony shows that the plaintiffs had expended a sum somewhat in excess of $900 and had paid down as part of the purchase price for the premises $1,000. It thus appears from a *résumé* of the whole case that the plaintiffs were grain farmers not familiar with the country in which the land about to be purchased is situated, knew nothing of the soil, knew nothing of orange trees, stated explicitly that they relied upon the honesty of the defendant and his agents, were informed that the land was free from hardpan, had standing upon upon it budded trees of the salable value of $1,500, that the defendant had been selling the trees therefrom at $1.50 each, whereas in fact the jury

and court found from the testimony, which they had a right to believe, that none of those representations was true, that the plaintiffs relied upon such representations and statements and were induced thereby to purchase the premises.

As to whether these representations were expressions of opinion or statements of facts or supposed facts, the case of *Herdan* v. *Hanson*, 182 Cal. 538 [189 Pac. 440], is pertinent; it is there said: "With reference to the contention that the evidence does not support the findings in question because the alleged and found fraudulent misrepresentations were but mere expressions of opinion, it will suffice to say that, when a statement concerning a subject matter of a transaction, which might otherwise be only an expression of opinion, is affirmed as an existing fact material to the transaction and reasonably induces the other party to consider and rely upon it as a fact, the statement then becomes an affirmation of fact within the meaning of the general rule as to fraudulent representations."

[4] We think all these circumstances bring this case within the provisions of subdivision 1 of section 1572 of the Civil Code, to wit, "The suggestion, as a fact, of that which is not true, by one who does not believe it to be true," and that the judgment of the trial court should be affirmed, and it is so ordered.

Finch, P. J., and Hart, J., concurred.