[Civ. No. 3428. Third Appellate District.—March 2, 1928.]

JOSEPH ANTOGNINI, Respondent, v. THE GRANDI COMPANY (a Corporation), Appellant.

ROBERT FARRELL, Respondent, v. THE GRANDI COMPANY (a Corporation), Appellant.

Treat, Bush & Ogden, Jordan L. Martinelli, Sullivan & Sullivan, and Theo. J. Roche, for Appellant.

Roy C. Lewis, Thos. P. Boyd and R. L. McWilliams for Respondents.

PLUMMER, J.—The plaintiffs above named, each having identical causes of action against the defendant, filed their separate complaints, to which the defendant filed answers, and upon the trial both actions were tried at the same time, upon the same testimony, and are submitted to us upon one record. The plaintiffs were awarded judgment in their respective actions, and the defendant appeals. The complaints are alike, except as to the amount sued for, the plaintiff Antognini praying for judgment in the sum of $15,000, and the plaintiff Farrell prosecuting his action for the recovery of a judgment in the sum of $20,000. Each complaint alleges that in the month of July, 1921, the defendant corporation represented to the plaintiff that its capital stock was reasonably worth, and that it had a book value of, $125 per share. That said representations were made to each plaintiff for the purpose of inducing the purchase by each plaintiff of the capital stock of the defendant corporation. Each complaint sets forth that the plaintiff named therein relied upon and believed the representations so made to him, and in reliance thereupon purchased stock in said defendant corporation, the plaintiff Antognini purchasing 120 shares of the capital stock of said corporation, and the plaintiff Farrell purchasing 160 shares of the capital stock of said corporation. The respective complaints further set forth that the representations so made were false, and were known to be false by the agents of the company representing the same, and that the stock did not have a book value of $125, and was not reasonably worth that sum, nor did it have a book value in excess of approximately $100 per share, and was not reasonably worth more than that sum per share. It is further set forth in the respective complaints that the plaintiff therein did not discover the falsity of said representations until on or about the fifteenth day of June, 1923. The complaints then set forth that the respective plaintiffs therein thereupon tendered to the defendant the number of shares so purchased and demanded the return of the purchase money paid therefor. The plaintiff Antognini had judgment for the recovery of the sum of $12,658.65, and the defendant Farrell had judgment for the recovery of the sum of $16,718.64. The

difference in the judgment awarded in the respective cases, from the amount respectively sued for, was arrived at by the trial court deducting from the $15,000 paid by the plaintiff Antognini to the defendant, of the sum of $2,341.65 paid by said company to said plaintiff Antognini in excess of the reasonable value of his services as an employee of said company, and of the sum of $3,281.36 paid by the defendant to the plaintiff Farrell, in excess of the value of the services rendered by him as an employee of the company. In other words, from the purchase price of stock of $15,000 paid by the plaintiff Antognini to the defendant, there was deducted from the judgment awarded him the said sum of $2,341.65, and from the $20,000 paid by the plaintiff Farrell for the purchase price of said stock to the defendant, there was deducted the sum of $3,281.36.

The findings of the trial court are to the effect that the duly authorized agents of the defendant represented to each plaintiff that the capital stock of the defendant Grandi Company was reasonably worth, and that it had a book value of $125 a share. That said representations were made for the purpose of inducing the plaintiff in each case to purchase shares of the capital stock of said defendant company. That the plaintiff in each case relied upon such representations, and relying upon the same, purchased certificates or shares of stock of said company, as alleged in the complaint. That the representations made by the agents of the company were false, and known by the agents making the same to be false. That said stock, to the knowledge of said defendant and to its agents, was not reasonably worth, nor did it have a book value of $125 per share or any sum in excess of $100 per share. That the plaintiffs did not discover the falsity of said representations until about the fifteenth day of June, 1923, and thereupon, and on or about the twenty-fifth day of June, 1923, said plaintiffs tendered and offered to return to the defendant the certificates of stock purchased by them respectively, and demanded the return of the purchase price paid for the same. It is further found that said plaintiffs were in the employ of the defendant for a number of months; that the reasonable value of their services was worth a certain named sum for each plaintiff, and that there was paid out of the funds of said company to each plaintiff the respective sums hereinbefore

mentioned, in excess of the value of the services rendered to defendant by the respective plaintiffs. As two certain items constituting assets of the company will be hereinafter discussed, we will here state that the court found that at the time of making the representations herein referred to, and that at the time of the sale of the stock referred to, the reasonable value of the lands owned by the plaintiffs (so appearing in the transcript, but evidently a clerical error and meaning "defendant") was the sum of $17,875, and that the reasonable value of the improvements was the sum of $42,000.

Upon this appeal it is contended by the defendant that the findings of the trial court are not supported by the evidence. That whatever statements the agents of the defendant made were simply matters of opinion and not statements of an existing fact, and that the property and the shares of stock therein had an actual value and a book value of at least $125 per share, provided the books were corrected, to admit a showing therein of the increased value of the real property owned by the defendant and of the improvements placed thereon.

As we read the appellant's argument, based upon the lack of testimony to support the findings, it would appear that reliance is placed chiefly upon the testimony introduced by the defendant. █ The rule is definitely settled that upon appeal neither preponderance of testimony nor credibility of witnesses, unless inherently improbable, can be considered. If there is testimony in the record which reasonably supports the findings of the trial court, our inquiry can extend no further and we are bound thereby. With this in view we will give a general summary of the testimony as disclosed by the record.

█ The plaintiff Antognini testified that about a year prior to his actual purchase of the stock he went to the place of business of the defendant company to pay a bill, and there had a conversation with Reno L. Grandi, the vice-president and manager of the defendant company. In this conversation Antognini mentioned the fact that he was about to sell his business. That thereupon Mr. Grandi said to him, "If you do sell, come in with us and we will sell you some stock." Nothing appears to have come of this conversation. A year later Antognini disposed of his business, and at that

time Mr. Grandi repeated his request that the plaintiff purchase some stock in the defendant company. Mr. Grandi is quoted as saying: "We have a good going business and we need a couple of good men that we know we can trust and help us along." Mr. Antognini explained that before he went into any business he desired to make a trip to Switzerland. After making this trip, and upon Mr. Antognini's return, Mr. Grandi again upon several occasions spoke to him about buying some stock, Mr. Antognini inquiring as to the value of the stock, to which Reno L. Grandi replied, "Well, $125 a share, but before you buy I will show you a statement of the books." Shortly thereafter Mr. Grandi showed the plaintiff a certain pen and ink statement which he had in his possession, saying, "Here's a statement of the books." Antognini, from this statement, figured out that the shares of stock were worth approximately $125 each, and thereupon purchased 120 shares thereof, paying therefor the sum of $15,000 by way of a check for that amount. Upon the trial of the case a certain statement was introduced in evidence by the defendant as a pen and ink statement, and is marked in the transcript Defendant's Exhibit No. 3. Both Mr. Antognini and Mr. Farrell testified that this exhibit differs somewhat from the pen and ink statement shown to them by Mr. Grandi. Mr. Antognini after the purchase of stock by him, went into the employ of the company, and for some months received a monthly salary of $200 per month. Mr. Farrell, after the purchase of stock by him, entered the employ of the defendant at a salary of $150 per month. After becoming employees of the company, both plaintiffs discovered that other employees of the company were receiving much larger salaries, and thereupon the salary of Antognini was raised to $400 per month, and the salary of Mr. Farrell to $425 per month. Upon attending a stockholders' meeting in the month of February, 1923, Antognini inquired as to the value of the stock per share and was told at that time it was only of the value of $105 or $106 per share; that the company had sustained a loss of between $20,000 and $30,000. The plaintiff Antognini not understanding how the loss could occur, and there being a financial statement presented at the meeting by Mr. Reno L. Grandi which did not show any loss as having occurred, the plaintiff asked for an explanation, to which Mr. Grandi

said: "I didn't like to show any loss on the books, so I kind of swelled up the assets. I didn't like to show any loss on the books, but we had a loss of between $20,000.00 and $30,000.00." Mr. Antognini inquired as to the department of the business in which the loss occurred, but so far as we read the record, no satisfactory explanation was made. Mr. Farrell's conversation with relation to the purchase of stock by him was had with one Muscio, an officer and employee of the defendant company. Thereafter, Mr. Farrell had a conversation with Mr. Reno L. Grandi, in which the latter said that they wanted a couple of good men that they could depend upon; that he, Farrell, asked Mr. Grandi the value of the stock; that Mr. Grandi said: "The book value is $125.00 and I will go to the house and get the statement for you." This statement Mr. Grandi obtained and handed to Mr. Farrell. The witness Farrell testified that he looked over the statement, took down the figures and upon calculating ascertained that the statement presented to him by Mr. Grandi showed the value of the shares of stock to be the sum of $125 each. Mr. Grandi explained that he had taken the statement from the books kept by the company. The discovery as to what the value of the stock really was, as claimed by the plaintiff, and the book value thereof at the time of the purchase, was made after the annual meeting referred to herein and after the plaintiffs had had the books of the company inspected. The testimony relating to Mr. Farrell's purchase of the stock is well shown by his cross-examination, as follows: "Q. Then you say, Mr. Farrell, just as soon as you asked Reno Grandi what the stock was worth, that he immediately said the book value was $125.00? A. He did, and says, 'I will get the statement and show it to you.' Q. But you asked what the value of the stock was? A. I says, 'What is the stock worth?' He says, 'The book value is $125.00. I will go and get the statement for you. . . . Q. Well, in your own mind did you question any item that was down on the pen and ink statement as to its correctness or as to whether it was a true representation of value? A. No, I did not. Q. You didn't question that? A. No. I looked at the statement and took it for absolutely correct as to what Mr. Grandi said. I depended on him for that. I didn't think he was producing a false statement. . . . Q. Now, what do you mean by 'book value'? A. That is

from the statement which he showed me. He said it was off of the books. That was the only value I knew of. Q. The only value you knew of was the book value? A. Yes, that was the paper value. Q. The paper value? A. Yes, from the books. Q. Well, didn't you also think and understand that by that statement the actual value of the stock was $125.00? A. Why, I thought that was the only value that was on it. I went entirely by the statement. I didn't know he had another value on it. . . . The Court: You didn't make any distinction between book value and actual value? A. No, I didn't."

Mr. Grandi's testimony differed from the testimony of Mr. Farrell in some particulars. Mr. Grandi testified: "I had the pen and ink statement on which I based my valuation. I hold Mr. Farrell that was not a book statement; that the book statement only showed $102.00 a share, but in my opinion, on account of extra values which we did not carry on the books, I believed the stock was worth $125.00." The questions and answers in this particular are as follows: " 'Q. What did you say to him the value was in your opinion? A. $125.00 a share. Q. What did you base that on? A. My opinion.' Mr. Grandi's attention was called to this testimony given by him at the making of his deposition, and he was asked: 'You so testified, did you not? A. Yes. Q. Said nothing whatsoever about the book value being $102.00, did you? A. No, not at that time. Q. Why didn't you at that time when this question was asked you? A. I couldn't say.' " Mr. Grandi further testified that Exhibit No. 3 was and is the pen and ink statement which he exhibited to the plaintiffs. Both plaintiffs denied this, and testified that the exhibit introduced as Defendant's Exhibit No. 3 was first seen by them at the time of the taking of Mr. Grandi's deposition. The testimony further shows that in the statement exhibited by Mr. Grandi to each one of the plaintiffs, and also that accepted and admitted in evidence as Defendant's Exhibit No. 3 purporting to be taken from the books of the Grandi Company, the merchandise account set forth therein had been raised from the real value shown by the books of $17,700.11 to $38,606.83. That the surplus account had been likewise raised from $2,271.62 to $23,178.34. As to these changes Mr. Grandi testified as follows: "Q. What did those extra values consist of? A. Extra values on real

estate and improvements. Q. Where did you get those extra valuations? A. From my own opinion." The witness then stated that he added the valuation to the merchandise account on account of the increased value of the buildings and improvements, and then further testified: "Q. Did any of them say that it was a peculiar thing that the increased value of real estate should be placed under the heading of merchandise? A. No. Q. Did any of them say that since you had a heading 'Buildings and Improvements' that that item of increased valuation should go under that heading? A. No. Q. No comments were made whatsoever? A. No. I just told you it was a family account." The witness testified he had no particular explanation for that any more than it was a family affair. The witness then further testified as follows: "Q. You say it was between your father and yourself that the statement was gotten up. I assume that you got your father's advice in the matter, didn't you? A. Oh, we talked over it, yes. Q. And you agreed between you that the real estate should be put down at $25,000.00, did you? A. We didn't put it down at $25,000.00, but we figured it was reasonably worth that. Q. Well, when you came to make up this $20,000.00—the increase—you had to make it up by adding the different individual items, did you not? A. Yes. Q. One of those items was an increase in the value of the real estate, was it not? A. Yes. Q. And that item, you say, was $10,000.00 increase, do you not? A. Yes. Q. Now, how did you compute that $10,000.00? A. Oh, I don't recollect. We figured that our stock was reasonably worth $125.00 and we worked that in. Q. I see. In other words, you figured the stock was worth $125.00, and you calculated in such manner to bring it up to $125.00, did you? A. Yes. Q. Yes. And therefore, you figured that by increasing the value of your assets by $20,000 that that would bring your stock up to $125.00 a share, did you? A. Somewhere there, yes. Q. And therefore, in order to make the $20,000.00, you took so much from this source and so much from that source a sort of guesswork proposition, and added it together to make $20,000.00, didn't you? A. Yes. We took it from the improvements in the buildings. We figured it had those actual valuations. Q. And when you got through adding up these various figures that you had practically guessed at, that amounted to $20,000.00,

didn't they? A. Well, I don't recall the exact amount that we got at the time, but $20,000.00 was what we added. Q. In other words, you had merchandise at that time at $17,000.00, and in this statement that you got out you had merchandise at $37,000.00; so what you did was added $20,000.00, didn't you? A. Yes. Q. Because what you were trying to get at was trying to show that your estimate of $125.00 per share was correct, wasn't that it? A. Yes. Q. And that was the reason you used $20,000.00, was it not? A. Yes." Mr. Muscio testified that he knew nothing about the transaction of the sale of the stock; that it was conducted by Mr. Grandi. Other officers of the company likewise testified. Upon cross-examination of Mr. Muscio a letter was introduced, written by him to one Sweeney, wherein a contract was referred to indicating that a sale of the stock in the Grandi Company at $100 would be satisfactory. This occurred some time along in December, 1921, a few months after the sale of stock to plaintiffs. The plaintiffs further testified that they understood the statement presented to them by Mr. Grandi to represent the correct value of the stock; that it represented the value of the stock after deducting the liabilities. That if the assets of the corporation were sufficient, after deducting the liabilities, to show an actual value of $125.00 per share, they would have bought the stock. It further appears from the testimony that the plaintiffs bought under the belief that the actual value of the stock and the book value were identical. The contention of the defendant corporation was, as we have herein stated, that the actual value was $125 per share, and that the book value only showed $102 per share, and this statement was made up upon that theory. The testimony of the witness Grandi is to the effect that he used the words "my opinion," as is illustrated by the following: "Q. What statement was made to him, if anything, about the value of the stock? We are speaking now of Mr. Antognini? A. I explained to him that in my opinion the stock was worth $125.00, and that the books did not show that. I told him that that statement was my opinion which made the stock worth $125.00, but the book value was $102.00." This testimony is contradicted by the plaintiffs, and under such circumstances the trial court was vested with the exclusive province of determining the facts and whether Mr.

Grandi did state that the books showed a value of $125 per share, and that the actual value thereof was the same as the book value.

The property owned, controlled, and operated by the defendant Grandi Company during the times involved in this transaction was situate at Point Reyes, in Marin County, and consisted of a lumber-yard, garage, a brick building in which was operated a merchandising store on the first floor, and a hotel in the floors above. The statement furnished by Reno L. Grandi to the plaintiffs listed the real estate as valued at the sum of $15,000, and the buildings and improvements thereon at the sum of $35,000. The trial court in its findings fixed the value of the real estate at the time the plaintiffs purchased stock in the defendant corporation at the sum of $17,875, and the value of the improvements thereon at that time at the sum of $42,000, and from which it is argued that the stock was actually worth more than shown by the statement, and that even though the statement did contain a fictitious excess sum of $20,906.83 added to the merchandise account, it did not materially affect the truthfulness of the statement. It may here be added that the statement, as shown by the findings of the trial court, did not contain any mention of a certain liability in the sum of $10,400, which sum is a trifle more than the added value found by the trial court, of the real estate and improvements, over the value listed in the statement. Outside of the merchandising account, the surplus account, and the failure to mention the liability just referred to in the sum of $10,400, the court found the statement to be a correct listing of the assets and liabilities appearing on the books of the company. The record also contains considerable evidence as to the reproduction cost of the buildings, improvements and other property owned by the defendant corporation in 1920, and the court found that the reproduction cost at that time would have been in the neighborhood of $91,000, but upon testimony which we think justified the conclusion of the court, the values of all the property owned by the defendant corporation at that time, less its liabilities, was only such as to give a valuation to the shares of stock of the sum of about $100. As we read the figures and calculate the same, the book value of each share of stock at the time of the sale thereof to the plaintiffs was a trifle below $100 per

share. The finding of the expert accountant who examined the books of the company returns a value of the shares of stock during the period under consideration, at $102.41 each. The trial court found the value not to be in excess of $100 per share, which we accept as correct for the reason that we have no means of determining whether the typewritten figures in the transcript may not have been incorrectly copied, and thus show a trifling difference in the value per share. It may be here stated that the answer of the corporation alleged the value of the real estate and improvements to be the sum of $78,152. Upon the subject of value, the defendant sought to introduce evidence as to the production cost or reproduction cost of the property belonging to the corporation, as of the year 1914. This testimony was excluded by the trial court, and it is here urged as error. As just stated, the court permitted testimony as to the reproduction cost of the properties, as of the year 1920; also as to the value of the property at that period, and in its findings upon the testimony so introduced, determined the value of the property as of that date. It was upon the statement taken upon the books of the corporation at the close of the year 1920 that the plaintiffs purchased their shares of stock, and we do not very well see how testimony as to the production cost of the property six years previously would have had any material bearing upon the issues tendered to the court for determination. While such testimony might, under the circumstances, have been admissible, which we do not decide, the real issue for the court to determine was the then value of the premises. The location of the premises, the business transacted by the corporation, and all the attendant circumstances connected with the year 1920, constituted a good foundation for the court determining the values as of that date. It is common knowledge that business and properties like that conducted and owned by the defendant in this case, situated in small communities, may be of great cost value at one period of time, and five or six years later, of a much less market value, or even actual value. While there is nothing in the record showing either the growth or lack of progress of the place designated as Point Reyes, we know that its geographical location removes it somewhat from the growing centers of population, and that it would be subject to all the depreciation attendant

upon small communities that start with glowing prospects and realize more or less of discouragement. At least nothing has been presented which would justify us in interfering with the findings of the trial court as to values. It is also urged that the trial court erred in admitting the letter written by the witness Muscio and presented to him and identified by him during his cross-examination wherein the sale price of the stock of the Grandi Company was being considered at the figure of $100 per share. The letter itself is not in the record, and we cannot say that its admission was prejudicial. It certainly tended in some measure to contradict the testimony of the witness, and also to show that if the corporation was willing to sell to Sweeney $15,000 worth of stock at $100 per share it was at least realizing a very good profit when at practically the same period of time it was selling $15,000 worth of stock to Antognini at $125 a share, and $20,000 worth of stock to the plaintiff Farrell at $125 per share.

 It is further argued that the plaintiffs were not injured by reason of the fact that during the time that they were in the employ of the defendant corporation they received the sums of money which we have hereinbefore stated in excess of the value of their services as employees. Without quoting the record it is sufficient to say that it discloses that the additional compensation paid to each plaintiff was paid because of the large disparity in salaries theretofore paid to the plaintiffs and the other employees of the corporation who were owners of its stock at the time the plaintiffs purchased their shares. It is further argued that the plaintiffs received a high percentage or rate of interest upon their investment. This, however, is an apparent fallacy. It was a payment out of the principal funds of the corporation irrespective of its earnings, and the court practically so found in decreeing that in return for the purchase price of the capital stock which had been paid by the respective plaintiffs, there should be deducted the excess sums hereinbefore referred to. A complete answer to the appellant's contention is in the case of *Spreckels* v. *Gorrill*, 152 Cal. 383 [92 Pac. 1011]: "The plaintiff paid twenty-two thousand five hundred dollars for the stock and it is neither alleged nor found that the stock was actually worth less than that sum. It is urged in argument that, as there is no presumption that it was

worth less, it must be presumed that it was and is worth at least that amount, that plaintiff is, therefore, as well off with stock of the cash value of twenty-two thousand five hundred dollars as he was with the money in his possession with which he bought the stock at that price and hence he has suffered no detriment. If this proposition were correct, it would at once put an end to actions founded on injury from a purchase induced by fraudulent representations as to the character or quality of the property purchased, except in cases where the purchaser could show that he made a bad bargain independent of the false representations. One who buys property is lawfully entitled to all the benefits of the purchase, that is, to the full value of the property he buys, regardless of the price he paid. And it is a fundamental principle of the law of fraud that where one has, by false and fraudulent representations as to the quality of property, led another to believe it to be possessed of valuable qualities and thereby wrongfully induced the other to buy the property, presumably in order to obtain the benefit of property possessing those qualities, the seller will not be allowed to show as a defense to an action for such fraud, that the property, in its actual condition, was worth the price paid, or more. The real question in all such cases is, whether or not the property, if it had been as represented, would have been of substantially greater value than its actual value in its real condition. The price actually paid is immaterial as an element in the cause of action, though it may be admissible evidence on the question of value.'' (Citing a long list of cases.)

The final objection which we need to consider is the one most strenuously urged, that whatever was said by the agents of the defendant corporation was simply an expression of opinion. We have set forth the testimony as to the statement taken from the books of the corporation sufficiently to show that this contention is unsound. There might be some reasonable argument that the testimony in this case shows that whatever was said about the actual values of the different kinds of property owned by the defendant corporation were expressions of opinion and not direct statements of fact, but when it comes to a statement of the book value of the certificates of stock, and what the books of the corporation showed, accompanied by a statement alleged to have

been taken from the books of the corporation and to have been a correct statement thereof, there is no rule for the theory that such language is only an expression of opinion. The entries on the books of the corporation were not matters of opinion. They were all statements of fact, and any transcript taken therefrom would partake of the same elements of exactness. If the statement said to have been taken from the books by Reno Grandi and exhibited to the plaintiffs had been a correct statement and not a fictitious statement as to some of its items, then as to any error in calculation made by the plaintiffs as to the book value of the shares of stock, they alone would have been responsible, as there would have been no misrepresentation. The testimony shows that the books of the corporation exhibited the merchandise value of the corporation at only $17,700.11. This item was increased to read $38,606.83, as testified by Reno Grandi in order to make the statement show a book value of $125 per share. A question propounded to Mr. Reno Grandi and his answer thereto may be properly here repeated: "Q. And therefore you figured that by increasing the value of your assets by $20,000.00, that would bring your stock up to $125.00 a share, did you? A. Somewhere there, yes." It only requires the statement to show that the very nature of the property precludes the possibility of anyone looking thereat from determining its value. There is no pretense in the record that either one of the plaintiffs was accustomed to handling merchandise or knew anything about the values of property carried in a general merchandise store, and they could only arrive at such values by an examination of the books or examining a transcript thereof. It may be here again stated that the trial court found the increase in value of the real estate and improvements amounted to the sum of only about $9,000. That the statement also failed to show an existing liability of $10,400. Hence, there was nothing upon which Reno Grandi was justified in basing his lifting of values, either of the real estate or of the merchandise schedule, in the sum of $20,906, or any other sum.

All of these facts, we think, bring this case squarely within the prohibitions contained in section 1572 of the Civil Code. Subdivision 1 of that section, defining actual fraud, reads: "The suggestion, as a fact, of that which is not true, by one who does not believe it to be true." Here

we have the positive statement of something which is not true, by a person whose own testimony shows that he knew it not to be true. We do not need to quote the other subdivisions of the section and content ourselves with simply saying that the record does not show anything warranting the increase made in the statement in order to show a book value of $125 per share of the shares in the defendant corporation.

In view of what we have just said, there appears no necessity for extending this opinion by considering and differentiating the cases cited by appellant, wherein it is held, under the circumstances of the particular cases, that representations as to value were matters of opinion. This question, like others, was primarily for the trial court to decide, as shown by the opinion in the case of *Stockton* v. *Hind*, 51 Cal. App. 131 (we quote from page 136) [196 Pac. 122, 124]: "It is conceded that the general rule is that an expression of opinion or belief, if nothing more, and if so understood and intended, is not a representation of a fact, and although false, does not amount to actionable fraud. Ordinarily, a person has no right to rely upon such statements, and if he does so rely, he cannot treat them as fraudulent, either for the purpose of maintaining an action in damages for deceit or for the purpose of rescinding the contract. Where there is any doubt as to whether or not a representation was intended and understood as a mere expression of opinion or a statement of fact, the question is not one of law, but of fact for the court or jury." (20 Cyc. 15; *Spreckels* v. *Gorrill*, 152 Cal. 395 [92 Pac. 1011]; 14 Am. & Eng. Ency. of Law, 36.)

The statement to which we have just referred furnished by Reno Grandi to the plaintiffs was no more an expression of opinion than would be a trial balance, but under the authorities just cited, if there was any doubt upon this question, it was for the trial court to resolve that doubt, and it has done so in favor of the plaintiffs.

This court, in the case of *Lombardi* v. *Sinanides*, 71 Cal. App. 272 [235 Pac. 455], had before it a case involving misrepresentation relating to a contract of sale of real estate. It was there held by this court, speaking through Mr. Presiding Justice Finch: "In equity it is generally held that where a vendor of realty makes a false representation of a

material fact, it is not a good defense to an action by the vendee seeking relief that such representation was innocently made. . . . This rule is most frequently applied in actions for the rescission of contracts, it being held that a false representation by a vendor of realty of a material fact, constituting an inducement to the contract of purchase, and on which the purchaser had the right to rely, is a ground for the rescission of his contract by a court of equity, and that, too, though the party making the representation may have been ignorant as to whether it was true or false; the real inquiry being not whether the vendor knew the representation to be false, but whether the vendee believed it to be true, and was misled by it in entering into the contract. A party will always be held to make good his statement in the form in which he makes it,'' etc. This case goes beyond any holding necessary to support the judgment under consideration. Here the representations were made by a statement in writing and figures purporting to exhibit to the plaintiffs what the books of the corporation showed, and which statement the agent of the corporation, by his own testimony, shows was not true.

In the case of *Stone* v. *McCarty*, 64 Cal. App. 158 [220 Pac. 690], this court had before it the question of statements as to values relating to the productive qualities of a certain tract of land, and also as to the sale value of nursery stock. It was there held that such statements came directly under the provisions of subdivision 1 of section 1572 of the Civil Code, relating to the suggestion, as a fact, of that which is not true, by one who did not believe it to be true. It was also held in that case that representations of value often afford a solid basis for actionable fraud.

In the recent case of *Palladine* v. *Imperial Valley Farm Lands Association*, 65 Cal. App. 727 [225 Pac. 291], the district court of appeal of the second district, in an opinion written by Presiding Justice Finlayson, considered similar questions with which we are here dealing, and set forth *in extenso* a great number of cases bearing upon the question of whether a statement of value is a statement of fact or a statement of opinion. While we need only refer to the Palladine case as an authority supporting the judgment of the trial court, we will quote the following from the opinion in the Palladine case: ''We think the following rule is sus-

tained by reason and the authorities; if the party expressing the opinion possesses superior knowledge, such as would reasonably justify the conclusion that his opinion carries with it the implied assertion that he knows the facts which justify it, his statement is actionable if he knows that he does not honestly entertain the opinion because it is contrary to the facts." In the case at bar Reno Grandi could not have honestly entertained the opinion that the books of the corporation exhibited a certain state of facts, because he had intentionally and purposely changed the figures so that the book value of the shares of stock in the corporation would appear to be such as concluded by the plaintiffs.

A similar case to the one with which we are dealing is that of *Iler* v. *Jennings*, 87 S. C. 87 [68 S. E. 1041]. The question there involved was a misrepresentation as to the book value of stock. The record shows that when the plaintiff asked as to the value of the stock the defendant replied, "The stock books will show it to be worth about $119, but so far as making a statement as to what the stock is worth or anything about the condition of the business, I won't do it. I will refer you to John Major, who is bookkeeper, and he can give you more information about it than I can. He knows more about the business. He has been here all the time as bookkeeper, and knows the hardware business better than I do," etc. The bookkeeper gave the intending purchaser an incorrect statement purporting to be a correct statement of what was exhibited by the books as to the book value of the stock. It was there held, among other things, that: "Such use of a statement of the corporate business by a director negotiating a sale of stock therein could not be regarded as other than a direct affirmation of its correctness, and if it was delivered for the purpose of assuring the buyer of the truth of the facts therein stated, and to induce him to purchase, and the buyer purchases in relying thereon, there was an express warranty," etc.

Other objections, such as that the proper tender of rescission was not made, and that the plaintiffs did not offer to rescind promptly, have been considered, but do not appear to us to call for extended consideration. ■ As to the tender, it is sufficient to say that the record shows that no objection was made thereto. As to the question of promptness, the record shows that within a very short time after

the discovery of the misrepresentation these actions were begun.

The judgments of the trial court are affirmed.

Hughes, J., *pro tem.*, and Finch, P. J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on March 31, 1928, and a petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 30, 1928.

All the Justices present concurred.