## SACRAMENTO SUBURBAN FRUIT LANDS CO. v. BOUCHER et al.

Circuit Court of Appeals, Ninth Circuit. December 17, 1929.

Motion for Modification of Opinion Denied January 13, 1930.

No. 5655.

Butler, Van Dyke & Desmond, of Sacramento, Cal., and Arthur C. Huston, of Woodland, Cal., for appellant.

Ralph H. Lewis and George E. McCutchen, both of Sacramento, Cal., for appellees.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge. This is one of a series of thirty cases involving charges of fraud in the sale of land by the appellant in a 12,000-acre subdivision of lands near the city of Sacramento. The allegations of the complaint and the answer and the proof are similar to that stated in Sacramento Suburban Fruit Lands Co. v. Walter A. Melin (No. 5671) 36 F.(2d) 907, to which reference is hereby made.

The court instructed the jury in part as follows:

"The defendant introduces other witnesses who live upon the project, and who testify to you as to the number of commercial orchards. Jarvis testifies to some eighty or ninety thousand trees, or commercial trees in this Rio Linda district, all part of the one project, and the plaintiff contends that they haven't produced any of these commercial orchard owners to disclose to you whether or not they are profitable. And that is true. They haven't. They have produced other men who raise family orchards, who was (say) the trees produce enough for their purposes, grow well. And there is a rule of law that if better evidence is available, and a party present weaker evidence, you have the right to take that into consideration in determining how much value you will give to the weaker evidence. I think it might be better evidence if you bring on the witness-stand an owner of one of these commercial orchards to tell how long it had been established, how well it had grown, and how far the fruit is commercial in quality."

To this instruction the appellant excepted as follows:

"Defendant excepts to the charge of the court * * * upon instruction upon the subject of failure to produce persons engaged in the commercial production of fruit; the burden of proof upon that subject is upon the plaintiff."

The appellee's entire case hinged upon the question of whether or not the land was capable of producing fruit in commercial quantities. If it was, the representation to that effect was true, and the representation as to value was also true. The burden of proving the misrepresentation and of proving the falsity thereof was upon the appellee; the burden did not shift to the appellant.

"The burden of producing a preponderance of evidence does not shift from side to side in the trial of a case but constantly remains with a party having the affirmative issue." 10 Cal. Jur. § 89, p. 783, citing Valente v. Sierra Ry. Co., 151 Cal. 534, 91 P. 481, and other cases. See, also, section 91, 10 Cal. Jur. 785.

The court in this case correctly instructed the jury to like effect. The court correctly instructed the jury that they were the judges of the fact. They were also properly ad-

monished that the court was to determine questions of law. The court informed the jury that, while the court might have expressed an opinion upon the matters of fact, they were not bound by that opinion.

Other instructions were given with reference to the burden of proof to the effect that the burden was upon the plaintiff with reference to his own case, among other things, as follows:

"When you come to ask yourself whether the plaintiff has proven his case by the greater weight of the evidence, you do not look to his evidence alone, but take into consideration all the evidence in behalf of both parties, defendant as well as plaintiff, and then determine whether the greater weight of the evidence is with plaintiff upon these vital allegations which he must prove, and if you find that his side of the scale outweighs that of the defendant in respect to them, he has proven his case and is entitled to the verdict."

It will be observed that in the instructions excepted to the court stated that there was a rule of law that, if better evidence was available and the party presents weaker evidence, "you have the right to take that into consideration in determining how much value you will give the weaker evidence." And then expressed the opinion which must be considered one of law rather than of fact, because the court was purporting to state a rule of law: "I think it might be better evidence if you bring on the witness stand an owner of one of these commercial orchards," etc.

Now it is apparent that, if there were any settlers who were either producing fruit for commercial purposes, or endeavoring to do so, they were as available to one side as to the other, and no presumption as to their testimony could be indulged in in favor of one side or against the other because of the failure of either to call such witnesses.

The trial court having charged the jury that the defendant's evidence was inferior to that of commercial orchardists in the vicinity, the jury could speculate as to what such witnesses would have testified, and weigh that speculation in reaching their verdict. In practical effect, the jury were informed that the evidence of commercial orchardists would be adverse to the defendant, if produced.

No case has been cited or found in which the party having the burden of proof has been able to increase the weight of his prima facie case by the presumption that other witnesses which were available to him as a part of his case would, if he had called them, be favorable to him solely because the defendant

to whom such witnesses were equally available in rebuttal failed to call such witnesses to rebut plaintiffs' prima facie case. The rule with reference to the failure of a party to produce the better evidence is based upon some sort of control or "power" superior to that of his adversary over the evidence or witnesses not produced. Ann. Cas. 1914A, page 910, note.

The rule is thus stated in 22 Corpus Juris, p. 115, § 56:

"Failure of a party to call an available witness possessing peculiar knowledge concerning facts essential to a party's case, direct or rebutting, or to examine such witness as to the facts covered by his special knowledge, especially if the witness would naturally be favorable to the party's contention, relying instead upon the evidence of witnesses less familiar with the matter, gives rise to an inference that the testimony of such uninterrogated witness would not sustain the contention of the party. No such inference arises where the only object of calling such witness would be to produce corroborative * * * evidence. * * * It has been laid down in a large number of cases that where a witness is equally available or accessible to both parties, no presumption or inference against either party can arise by reason of his failure to call such witness."

The author, however, takes issue with the latter statement in certain cases which need not now be discussed. See, also, Ann. Cas. 1914A, 916, note. Assuming, as the trial court did, that the evidence of the owners of the commercial orchards was a higher grade of evidence, or "better evidence" than the experts who had tested the soil produced both by the appellee and appellant, and that it was superior to the evidence with relation to the depth of the soil and of the underlying hardpan, on which side was the burden to produce such evidence? Assuming that the appellee had made a prima facie showing of fraud by the evidence of its soil experts and by evidence as to his own failure to successfully grow trees, is he in a position to claim, as against the appellant, that the evidence of orchardists in the larger tract who are attempting to grow fruit commercially was a better and higher degree of evidence than that which he himself had produced? In order to answer these questions and to determine the effect of the instruction under consideration, we will examine the state of the evidence further and more fully.

Appellee produced a witness, J. F. McKew, who had an action similar to plaintiff pending in court. He testified he had plant-

ed 65 trees, and only 30 were living on his property.

Charles T. Tipper also testified for the appellee that he was plaintiff in a similar action. He testified that out of 308 fruit trees which he had planted 76 were dead, and a dozen were dying; that the trees did not produce anything worth calling fruit. He also testified that some parts of the tract really looked healthy, but the figs are not worth picking off. "Out of what I had left I would say one-third were in good healthy condition."

Emil Johnson, a witness for appellee, also testified that he had a similar suit pending. He testified that after three years 17 trees out of 65 were dead. Out of 1,350 vines he planted he estimated that 1,000 were alive, "some of them were doing pretty fair and some of them doing poor."

R. B. Loucks, another witness for appellee, testified that he was plaintiff in a similar action. He said: "We set out 50 trees the first year and 10 the next year. I have possibly 50 or 60 trees. Where they are set three feet and a half in depth they are doing pretty good, but the other end of the orchard is only about 18 inches. The trees are only about half as large as the others, and some of them are scrawny, and I think are dying. You can gradually see the difference; the deeper the soil the better the tree."

It will be observed, then, that the plaintiff relied upon the testimony of several other plaintiffs in similar suits, who were obviously interested in sustaining the appellees' case, to the general effect that they have been unsuccessful in keeping alive the fruit trees they have planted, and had failed so far to raise fruit successfully. No one of them had attempted to raise fruit in commercial quantities, and each one of them had planted a relatively small number of trees. In addition to this line of evidence, the appellee produced the testimony of an expert on soil conditions and rested his case.

H. F. Bremer, a witness for the appellant, testified as follows:

"I live in the Rio Linda district for about three years this time. I formerly owned other property in Rio Linda and on that property lived about two years. I sold it; moved away, and came back and purchased another tract. I am engaged in the poultry business now, and was engaged in the poultry business before.

"On that tract I previously owned, I planted some fruit trees. Where I planted these trees the soil was about two and a half feet in depth. I blasted for the holes in planting those trees. There were about fifty trees planted on that place. That is known as a family orchard, with various varieties of fruit. Those trees thrived while I was there and after planting them. They were planted in the spring of 1923. I have seen them recently. They are still alive and bearing, and are evidently in a healthy condition. I have seen the fruit on them. They bear fruit of good quality and good size. That land at that depth, as blasted, I would say was adapted to the raising of fruit.

"I have planted a few trees on the place I own at the present time, about a dozen, for a family orchard. I did not blast for those trees. The depth of soil where they are planted is about the same, two and a half feet. Those trees have done very well. I have some cherries going on the second year, and the other were only planted last spring. They are too young to bear fruit. The growth, however, has been very good."

On cross-examination he testified:

"From what I have observed and learned from friends I would say the land is adapted to fruit raising, and would say it is especially adapted to the commercial raising of fruit."

Charles Unsworth, a witness for appellant, stated he lived in the Rio Linda district; had five acres there; had lived in California since 1889; "four of my five acres were planted to fruit. The shallowest soil we found on my place was about 30 inches. The majority of it is a great deal deeper. I have been growing mostly peach trees. They are in very good condition. I got a good crop of peaches from them this year. The crop was large and the quality good and well flavored."

On cross-examination he testified:

"I sold a portion of the fruit produced on the place this year. I sold, I should judge, four tons and a half. * * * I got over $100 anyway this year from the peaches. *. * * I took five lug boxes off one tree, and I would judge they average between two and three lug boxes to the tree."

L. Hagel, a witness for the defendant, testified he had lived on the property for five years. "I have 40 acres in my place and about 28 acres are planted. I have 58 fruit trees, constituting a family orchard, with 36 different varieties of fruit. Where the orchard is planted the soil runs from 8 inches to 2 feet in depth. There is a hardpan layer underneath that. I blasted for my trees. They have done very well. I have had all the fruit I want for my family and

some over. The trunks of my cherry trees average from two and a half to three and a half inches in diameter, and I have a nectarine tree measuring six inches. I have twenty-eight acres of vineyards. Last year I got between four and six tons off nine acres which were the first ones up there. I have been picking the crop this year, but I can't say how much it will give. Already I have delivered about 4500 pounds. The quality is A-1. I consider the soil on my place adapted to the raising of fruit and vines."

On cross-examination he testified: "I have produced four to six tons of grapes on about nine acres."

John Posehn, a witness for appellant, testified:

"I live in the Rio Linda District, in subdivision No. 6. I have lived there 5 years. I have a family orchard of about 40 trees of different varieties—plums, peaches and pears, figs and cherries. I planted them in 1924. I blasted for the trees. The soil there is from 6 inches and a foot to 2 feet in depth. The trees have grown well on that soil. They bear very well. I have all I need. I have about 400 vines of different table grapes. I picked a bunch on Monday of Thompson Seedless that weighed 60 pounds, and this morning I picked one of 45 pounds."

On cross-examination he stated he had never been in the orchard business, raising fruit trees for commercial purposes.

LeRoy Gehris, who lived on the subdivision, testified the depth of the soil on his place varied from 6 to 28 or 30 inches. He planted 41 fruit trees for family orchard purposes, peaches, plums, nectarines, cherries, apricots, pears, and all fruit. Blasted for the trees, and they made a very nice growth. "They were a year old last April."

The witness testified further as follows:

"In Sacramento County, outside of the Rio Linda district, fruit is grown on hard pan land no greater depth than Rio Linda, successfully and commercially. Over a considerable portion of the San Joaquin Valley I find a similar condition. On the portion of the valley east of the river peculiarly hard pan, up and down the valley, I find fruit being raised successfully and on a commercial scale on shallow lands with hard pan. We have plenty of hard pan in the Fresno district, and find orchards down there in hard pan land. There is no arbitrary standard among horticulturists that sets a minimum limit of five feet of top soil necessary to the growth of fruit on a commercial basis. It is not necessary, in order to grow fruit commercially, that there be five feet of soil on top of the hard pan, nor any recognized standard of any depth. The question depends primarily on irrigation and drainage, and not upon the depth of soil."

M. A. Crinkley, secretary of the appellant company since 1916, testified for the appellant that they purchased the property subdivided in 1911, some at $85 an acre and some at $100 an acre. That the property stood them $200 an acre. "That does not include sale cost or overhead; just includes improvements, taxes and the cost of the land, and the general work we have done to advance the colony. It is our selling cost that takes our profit away. That does not include the expenses of the company in connection with it."

On cross-examination he testified 90 per cent. of settlers on the property were engaged in the chicken business, and he also testified "that land out there is being sold for fruit land, fruit and poultry. People go into commercial raising of fruit if they want to. All of that land is adapted to some kind of fruit. My opinion in that regard never has changed."

H. M. Edmunds, a witness for the appellant, living in the Rio Linda district, testified he had an orchard on the property. The principal business of the Rio Linda district was the raising of poultry. The depth of the soil on his property is from 6 inches to 3 or 4 feet. He blasted for his fruit trees, they made a fine growth, and produced well. "I have different varieties in my family orchard. Some do better than others. None of them do not do well."

O. W. Jarvis, for the defendant, testified as follows:

"I have been engaged in horticultural work for a number of years. I am a graduate of the Utah College of Agriculture. For a while I was County Farm Advisor of Sacramento County. My life has been devoted to horticultural and agricultural work. I am familiar with the Rio Linda district. I was specially employed to make a fruit survey there. I recently went with Mr. Morley over the district and investigated the trees and vines. We were sent out more to make a study of the soil conditions, and incidentally, the fruit in general. In our investigations we found the soil conditions throughout the district varying. With respect to production and richness of the soil, we found the Rio Linda soil producing crops, fruits, vegetables and gardens. We made notes of each tract as we went by and arrived at an estimate. We found family orchards and some commercial orchards.

"As to the condition of trees growing on the district, the fruit trees were not well cared for. Therefore, they were not in as thriving a condition as they would be were the fruit industry profitable. We found them varying—some good, some bad, in all parts of the district, and on all depths of soil. Where the places showed evidence of having been cared for, pruned and irrigated, as a rule the trees looked promising and thriving.

"We made a count, or estimate, of the different varieties of fruit trees. Almonds, 18,720; olives, 9,370; peaches, 7,060; plums, 2,950; pears, 8,875; prunes, 6,040; figs, 10,230; grapes, 97,650; apricots, 1,550; walnuts, 490; cherries, 9,465; apples, 600; persimmons, 100.

"These were trees other than family orchards. Family orchards were estimated at about 25 trees to the orchard, 325 orchards, or a total of 8,100 trees, about 10 vines to a family orchard making an additional 3,250, or a total of trees in the district of 91,750; vines 100,900."

He also testified:

"There was no reason whatever, in my opinion, why fruit could not be produced on the area where the Boucher place is located, if the soil were properly prepared by blasting, cultivation, etc."

The appellant's evidence in rebuttal disclosed for the first time on the trial that there were large orchards in the tract, and this testimony was introduced to show that these orchards were successful. The court, in that regard, informed the jury, in the instruction under consideration, that the appellant had introduced other witnesses who lived on the project to testify as to the "number of commercial orchards." The evidence as to the existence of large or "commercial orchards" as it was presented in the case was brought out by appellee in the cross-examination of appellant's witnesses. The names of the owners of these orchards and their whereabouts was not disclosed by the evidence. Under these circumstances the court in effect instructed the jury that the defendant, having disclosed to the jury the fact that there were nearly 100,000 trees and as many vines growing upon the tract apparently in good condition, thereby assumed the burden of producing the owners of these trees to testify as to the quantity and quality of fruit raised by them for the market.

The question of sale and sale value of the fruit was excluded from the case by the instructions to the jury. In default of that testimony, the jury were in effect instructed to assume that these owners would have testified that they were unable to raise fruit in commercial quantities or quality. The instruction was clearly erroneous, and the error in the instruction was sufficiently pointed out to the court in the appellant's exception thereto, which called attention to the fact that the burden of showing that the property would not grow fruit in commercial quantities was upon the appellee and remained with him throughout the trial. The disclosures that there were fruit trees in large quantities on the property, instead of imposing upon the appellant the burden of producing further evidence to show that they did bear fruit in commercial quantities, merely emphasized the failure of the appellee to introduce testimony available to him in support of his claim, if his claims were true. Thus, if it could be said that either side was under obligation to call these witnesses, that obligation rested more heavily upon the appellee, who had the burden of proof, than upon the appellant, who could rely upon the appellee's failure of proof. Our view is, however, that the rule of law given by the court to the jury was not at all applicable. The question before the court was as to the fertility of the soil and its adaptability for production of fruit. There are probably hundreds of thousands of persons in California who could express an intelligent opinion upon that subject, although their opinions would be of different weight. It cannot be said, as a matter of law, that the evidence of the owners of fruit trees on other property would be of any higher value or greater weight than the testimony of experts as to the soil conditions upon the property in question, or that the evidence of owners of large orchards was better than that of owners of small orchards. Indeed, there is always a serious question as to whether evidence as to conditions of fruit crops or other crops on other pieces of property should be received as evidence of the value or fertility of the land in question. Such evidence always involves a comparison of conditions which is very difficult to make, and for that reason must sometimes be rejected as of no weight or probative value. See Palladine v. Imperial Valley Land Co., 65 Cal. App. 727, 225 P. 291. We believe, however, that such evidence was admissible under the circumstances in this case showing that the appellant's representations applied to the whole tract. The weight of the evidence was a question for the jury. Certainly the judge should not instruct the jury that evidence of the success or failure of other owners to produce crops was superior as a matter of law

to evidence of soil conditions on the property involved. Such evidence must involve a multitude of factors, including the personal equation varying in each case.

The admissibility of testimony in regard to the meager crops on adjoining land is commented on by the District Court of Appeals of California in Palladine v. Imperial Valley Land Co., 65 Cal. App. 727, 751, 225 P. 291, 301, as follows:

"Evidence of this kind, injecting collateral issues into a case, should be received with caution, and then only when it is obvious to the court, from the similarity of conditions, that it affords a safe and reliable standard of comparison."

The relaxation of the general rule excluding evidence of this sort, while proper in this case, enabled the appellee to introduce the plaintiffs in similar cases then pending to establish their own failure and throw on the appellant the burden of meeting every plaintiff in every case. To add to that burden the additional burden imposed by the instruction was to require the appellant also either to show that all the "commercial orchards" in the district were a success, or, failing in that, to show that their failure and the reasons therefore were in each and every case not due to soil conditions or to the presence or depth of the hardpan on his land. Moreover, the instruction was erroneous, for the further reason that it was not applicable to the conduct of the defendant, for the reason that he did produce a commercial orchardist, Arthur Mosley, who testified that he was the owner of a commercial orchard one mile south of Rio Linda colony, that his property was substantially the same as that in the colony and in detail with reference to the degree of success obtained by him on his own orchard and on others cared for by him. His testimony was in part as follows:

"I am engaged in the fruit-raising business. My place is approximately one mile south of the Rio Linda Colony, in the Arcade District, on the Haggin Grant. I am the owner of sixteen acres of land, and have planted there peaches, pears, plums, different varieties of fruit. That is what is known as a commercial orchard. It will grow fruit for sale.

"The depth of soil on my property varies from a foot to two or three feet, and above the hard-pan is of the same character and quality as land throughout the uplands in the Rio Linda District. The ground was blasted when the orchard was planted. We have a hard-pan strata underlying the soil

that hard-pan is about the same texture and quality as the hard-pan which underlies Rio Linda.

"I also take care of some other orchards in the vicinity. One place is twenty-acres, one thirty. The soil is about the same character and depth, and blasted also.

"The trees on my place bore good crops this year. They are strong and healthy, and a good growth for their age. Last year the crops were good. I know about fruit conditions generally in other places. The crops done well in comparison with others. The crops in other places under my care were also about the same—heavy crops. The peaches were light on my place this year. Last year they were heavy. They were of good grade and quality."

The instruction complained of was prejudicially erroneous.

Judgment reversed.